**JENNER & BLOCK LLP**
Brandon D. Fox (SBN 290409)
BFox@jenner.com
Rachael A. Goldman (SBN 335138)
RGoldman@jenner.com
515 South Flower Street, Suite 3300
Los Angeles, CA 90071-2246
Telephone:    +1 213 239 5100
Facsimile:    +1 213 239 5199

Kate T. Spelman (SBN 269109)
KSpelman@jenner.com
2029 Century Park East, Suite 1450
Los Angeles, CA 90067-2901
Telephone:    +1 213 239 6900
Facsimile:    +1 213-239 5199

Attorneys for Defendants
Fox Corporation and Fox News Network, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SONNI ECHEVERRIA-CORZAN, individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br><br>      v.<br><br>FOX CORPORATION and FOX NEWS NETWORK, LLC,<br><br>                              Defendants. | Case No. 25-cv-04253-AMO<br><br>**ANSWER TO FIRST AMENDED CLASS ACTION COMPLAINT** |

Defendants Fox Corporation and Fox News Network, LLC (collectively, "Fox" or "Defendants"), by and through their attorneys at Jenner & Block LLP, hereby Answer the First Amended Class Action Complaint ("FAC") filed by Plaintiff Sonni Echeverria-Corzan ("Plaintiff") as follows:

Except as otherwise expressly stated herein, Fox denies each and every allegation contained in the FAC. Fox states that the headings, subheadings, and footnotes throughout the FAC do not constitute well-pled allegations in fact and therefore require no response. To the extent a response is required, Fox denies all allegations in all headings, subheadings, and footnotes of the FAC. Fox expressly reserves the right to amend or supplement its Answer as may be necessary.

As to the paragraph prior to the start of the numbered paragraphs in the FAC, Fox admits only that Plaintiff has brought this action as a putative class action, and denies all remaining allegations.

## NATURE OF THE ACTION

1. Defendants own and operate www.foxnews.com/ (the "Fox News Website" or "Website"), which is a news and political commentary website.

Answer: Admitted.

2. When users visit Defendants' Website, Defendants cause at least three Trackers—the PubMatic Tracker, ADNXS Tracker, and OpenX Tracker (collectively, the "Trackers")—to be installed on the Website visitors' internet browsers. The Trackers are operated by separate and distinct third parties, respectively: PubMatic, Microsoft, and OpenX (the "Third Parties").

Answer: Fox admits only that at certain times third-party business tools PubMatic, ADNXS, and OpenX have been used on the Fox News Website. Fox is without sufficient knowledge or information to form a belief as to the remaining allegations contained in Paragraph 2, and on that basis denies them.

3. Through their respective Trackers, each of the Third Parties collect the Website users' internet protocol ("IP") addresses and other device identifier information such as device type, and browser type ("Device Metadata"). The Third Party Trackers also set a cookie that includes a unique user identifier, which the Trackers collect on subsequent visits and which is used by the Third Parties to identify and de-anonymize the user.

1    <u>Answer</u>:  Fox is without sufficient knowledge or information to form a belief as to the

2    allegations contained in Paragraph 3 as to any particular Website visitor, and on that basis denies

3    them.

4    4.    Defendants and these Third Parties use the data collected by the Trackers to identify

5    and de-anonymize users, hyper-target advertisements to users, and to enrich themselves.

6    <u>Answer</u>:  Fox is without sufficient knowledge or information to form a belief as to the

7    allegations concerning how "Third Parties" use information, and on that basis denies them.  Fox

8    denies all remaining allegations in Paragraph 4.

9    5.    Because the Trackers capture Website visitors' "routing, addressing, or signaling

10    information," the Trackers constitute a "pen register" under Section 638.50(b) of the California

11    Invasion of Privacy Act ("CIPA"). (Cal. Penal Code § 638.50(b).)

12    <u>Answer</u>:  Paragraph 5 consists of legal conclusions to which no response is required.  To

13    the extent a response is required, Fox denies all allegations in Paragraph 5.

14    6.    By installing and using the Trackers without Plaintiff's prior consent and without a

15    court order, Defendants violated CIPA § 638.51(a).

16    <u>Answer</u>:  Paragraph 6 consists of legal conclusions to which no response is required.  To

17    the extent a response is required, Fox denies all allegations in Paragraph 6.

18    7.    The allegations here are made more invasive by the entities operating the Trackers

19    and collecting Plaintiff's and Class Members' IP Addresses and Device Metadata. PubMatic and

20    OpenX are registered data brokers in California who focus on identifying and de-anonymizing

21    users through identity resolution services. The purpose of this is to enrich the value of Defendants'

22    Website users by linking those users' IP addresses and Device Metadata to profiles that contain as

23    much personal and demographic information as possible. Users are then offered up for sale with

24    all this collated information to interested advertisers through platforms like PubMatic's.

25    Advertisers can then better target Website users based on these attributes and will therefore pay

26    Defendants more to show advertisements to Defendants' users. And the Third Parties share all this

27    data between each other and with various other entities through a process called "cookie syncing"

28

1  meaning Plaintiff's and Class Member's information winds up in the hands of untold numbers of

2  third parties without consent. All of this enriches Defendants through advertising revenue, makes

3  the Third Parties' services (*i.e.*, their Trackers) more valuable to Defendants and other customers,

4  and strips Plaintiff and Class Members of their anonymity and privacy in the process.

5  <u>Answer</u>:  Fox is without sufficient knowledge or information to form a belief as to the

6  allegations in Paragraph 7 concerning third parties' conduct, and on that basis denies them.  As to

7  the allegations in Paragraph 7 that contain legal conclusions, no response is required.  Fox denies

8  all remaining allegations in Paragraph 7.

9  8.  Plaintiff brings this action to prevent Defendants from further violating the privacy

10  rights of California residents, and to recover statutory damages for Defendants' violation of CIPA

11  § 638.51.

12  <u>Answer</u>:  Paragraph 8 consists of a legal conclusion to which no response is required.  To

13  the extent a response is required, Fox denies all allegations in Paragraph 8.

14  **<u>THE PARTIES</u>**

15  9.  Plaintiff Sonni Echeverria-Corzan is a citizen of the State of California over the age

16  of 18, and lives in Oakland, California with an intent to remain there. Plaintiff is therefore a

17  resident of California. Plaintiff was in California when she visited the Fox News Website.

18  <u>Answer</u>:  Fox is without sufficient knowledge or information to form a belief as to the

19  allegations contained in Paragraph 9, and on that basis denies them.

20  10.  Defendant Fox Corporation is a Delaware corporation with its principal place of

21  business in New York.

22  <u>Answer</u>:  Admitted.

23  11.  Defendant Fox News Network, LLC is a limited liability company formed in

24  Delaware with its principal place of business in New York.

25  <u>Answer</u>:  Admitted.

26

27

28

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to Article VI, section 10 of the California Constitution and California Code of Civil Procedure section 410.10. This action is brought as a class action on behalf of Plaintiff and Class Members pursuant to California Code of Civil Procedure § 382.

Answer:  Paragraph 12 consists of a legal conclusion to which no response is required. To the extent a response is required, Fox denies all allegations in Paragraph 12.

13.     This Court has personal jurisdiction over Defendants pursuant to California Code of Civil Procedure § 410.10 because Defendants conduct substantial business such that Defendants have significant, continuous, and pervasive contacts with the State of California.

Answer:  Paragraph 13 consists of a legal conclusion to which no response is required. To the extent a response is required, Fox states that it has not challenged personal jurisdiction in this case, but denies all remaining allegations in Paragraph 13.

14.     *First*, using the information collected by the Trackers (as alleged in more detail below), Defendants target Californians with advertisements based in part on their California residence. For instance, the PubMatic Tracker allows users to be targeted in geography-based campaigns. (See Figure 21, *infra*). The ability to use IP addresses for "geomarketing" is also described in more detail below. (See Factual Allegations § II.A.2, *infra*). Defendants also reap substantial revenue by selling its California Website users to advertisers.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 14 concerning third parties' conduct and capabilities and "[t]he ability to use IP addresses for 'geomarketing,'" and on that basis denies them.  Fox denies all remaining allegations in Paragraph 14.

15.     Further, because an IP address identifies a user's approximate geographic location, Defendants know that the users they are enabling to be sold by the Trackers are from California.

Answer: Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 15 concerning IP addresses, and on that basis denies them. Fox denies all remaining allegations in Paragraph 15.

16.     Thus, Defendants have purposefully availed itself of the California market by (i) knowingly offering up its California Website users for sale to advertisers, and (ii) deriving substantial revenue from the sale of California Website users to interested advertisers.

Answer: Paragraph 16 consists of legal conclusions to which no response is required. To the extent a response is required, Fox denies all allegations in Paragraph 16.

17.     *Second*, Plaintiff's claims relate to Defendants' contacts with California because it was in California that the Website caused the Trackers to be installed on Plaintiff's browser, and it was in California that the Trackers instructed Plaintiff's browser to send her IP address, Device Metadata, and unique user ID to the Third Parties to identify her and sell her information to advertisers. (See *Popa v. Harriet Carter Gifts, Inc.* (3d Cir. 2022) 52 F.4th 121, 131.)

Answer: Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 17 concerning whether or where Plaintiff accessed the Website, and on that basis denies them. As to the allegations in Paragraph 17 that contain legal conclusions, no response is required. Fox denies all remaining allegations in Paragraph 17.

18.     *Finally*, it is reasonable to exercise jurisdiction over Defendants. Indeed, Defendants maintain offices in Los Angeles.

Answer: Fox admits only that Defendants maintain offices in Los Angeles. As to the allegations in Paragraph 18 that contain legal conclusions, no response is required. To the extent a response is required, Fox denies the allegations in Paragraph 18 that contain legal conclusions. Fox denies all remaining allegations in Paragraph 18.

19.     This Court is the proper venue for this action under the California Code of Civil Procedure § 395.5 because the conduct alleged in this Complaint occurred in this County.

Answer: Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 19 concerning whether or where Plaintiff accessed the Website, and on

that basis denies them.  As to the allegations in Paragraph 19 that contain legal conclusions, no response is required.  Fox denies all remaining allegations in Paragraph 19.

**FACTUAL ALLEGATIONS**

**THE CALIFORNIA INVASION OF PRIVACY ACT**

20.    The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." (Cal. Penal Code § 630.)

Answer:  Paragraph 20 purports to quote Cal. Penal Code § 630, which speaks for itself. As to the allegations in Paragraph 20 that contain legal conclusions, no response is required.  To the extent a response is required, Fox denies all allegations in Paragraph 20.

21.    As relevant here, CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

Answer:  Paragraph 21 purports to quote Cal. Penal Code § 638.51(a), which speaks for itself.  As to the allegations in Paragraph 21 that contain legal conclusions, no response is required. To the extent a response is required, Fox denies all remaining allegations in Paragraph 21.

22.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." (Cal. Penal Code § 638.50(b).)

Answer:  Paragraph 22 purports to quote Cal. Penal Code § 638.50(b), which speaks for itself.  As to the allegations in Paragraph 22 that contain legal conclusions, no response is required. To the extent a response is required, Fox denies all remaining allegations in Paragraph 22.

23.    A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing,

addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." (Cal. Penal Code § 638.50(b).)

Answer:  Paragraph 23 purports to quote Cal. Penal Code § 638.50(b), which speaks for itself.  As to the allegations in Paragraph 23 that contain legal conclusions, no response is required. To the extent a response is required, Fox denies all remaining allegations in Paragraph 23.

24.    In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 24 concerning what "pen register" and "trap and trace device" mean in "plain English," and on that basis denies them.  As to the allegations in Paragraph 24 that contain legal conclusions, no response is required.  Fox denies all remaining allegations in Paragraph 24.

25.    Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology has advanced, however, courts have expanded the application of these surveillance devices to the Internet.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 25 concerning how law enforcement "historically" used pen registers and trap and trace devices, and on that basis denies them.  As to the allegations in Paragraph 25 that contain legal conclusions, no response is required.  Fox denies all remaining allegations in Paragraph 25.

26.    For example, if a user sends an email, a "pen register" might record the email address it was sent from because this is the user's *outgoing* information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from because this is *incoming* information that is being sent to that same user.

1      Answer:  Fox is without sufficient knowledge or information to form a belief as to the

2  allegations in Paragraph 26 concerning what a pen registers or trap and trace device "might" do,

3  and on that basis denies them.  As to the allegations in Paragraph 26 that contain legal conclusions,

4  no response is required.  To the extent a response is required, Fox denies all remaining allegations

5  in Paragraph 26.

6      27.  Although CIPA was enacted before the dawn of the Internet, "the California

7  Supreme Court regularly reads statutes to apply to new technologies where such a reading would

8  not conflict with the statutory scheme." (*In re Google Inc.* (N.D. Cal. Sep. 26, 2013) 2013 WL

9  5423918, at *21; see also, *e.g., Shah v. Fandom, Inc.* (N.D. Cal. Oct. 21, 2024) --- F. Supp. 3d ---

10  , 2024 WL 4539577, at *4 [finding trackers similar to those at issue here were "pen registers" and

11  noting "California courts do not read California statutes as limiting themselves to the traditional

12  technologies or models in place at the time the statutes were enacted"]; *Mirmalek v. Los Angeles*

13  *Times Communications LLC* (N.D. Cal. Dec. 12, 2024) 2024 WL 5102709, at *3-4 [same]; *Lesh*

14  *v. Cable News Network, Inc.* (S.D.N.Y. Feb. 20, 2025) --- F. Supp. 3d ---, 2025 WL 563358, at *3-

15  5 [same]; *Moody v. C2 Educ. Sys. Inc.* (C.D. Cal. 2024) 742 F. Supp. 3d 1072, 1076 ["Plaintiff's

16  allegations that the TikTok Software is embedded in the Website and collects information from

17  visitors plausibly fall within the scope of §§ 638.50 and 638.51."]; *Greenley v. Kochava, Inc.* (S.D.

18  Cal. 2023) 684 F. Supp. 3d 1024, 1050 [referencing CIPA's "expansive language" when finding

19  software was a "pen register"]; see also *Javier v. Assurance IQ, LLC* (9th Cir. May 31, 2022) 2022

20  WL 1744107, at *1 ["Though written in terms of wiretapping, [CIPA] Section 631(a) applies to

21  Internet communications."].)

22      Answer:  Paragraph 27 consists of legal conclusions and characterizations to which no

23  response is required.  To the extent a response is required, Fox denies all allegations in Paragraph

24  27.

25      28.  This accords with the fact that, "when faced with two possible interpretations of

26  CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that

27

28

provides the greatest privacy protection." (*Matera v. Google Inc.* (N.D. Cal. Aug. 12, 2016) 2016 WL 8200619, at *19.)

Answer:  Paragraph 28 consists of legal conclusions and characterizations to which no response is required.  To the extent a response is required, Fox denies all allegations in Paragraph 28.

29.    Individuals may bring an action against the violator of any provision of CIPA— including CIPA § 638.51—for $5,000 per violation. (Cal. Penal Code § 637.2(a)(1).)

Answer:  Paragraph 29 recites portions of Cal. Penal Code § 637.2(a)(1), which speaks for itself.  As to the allegations in Paragraph 29 that contain legal conclusions, no response is required. To the extent a response is required, Fox denies all remaining allegations in Paragraph 29.

**DEFENDANTS VIOLATES THE CALIFORNIA INVASION OF PRIVACY ACT**

30.    To make Defendants' Website load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendants' server where the Website data is stored. In response to the request, Defendants' server sends an "HTTP response" back to the browser with a set of instructions. A general diagram of this process is pictured at Figure 1, which explains how Defendants' Website transmits instructions back to users' browsers in response to HTTP requests.

**Figure 1:**



Answer:  Fox admits only that, to facilitate loading of the Website, when an internet browser sends an "HTTP request" or "GET" request to Fox's server asking the Website to load, one or more servers generally sends an "HTTP response" back.  Fox is without sufficient

1  knowledge or information to form a belief as to the remaining allegations in Paragraph 30, and on

2  that basis denies them.

3       31.    The server's instructions include how to properly display the Website—*e.g.*, what

4  images to load, what text should appear, or what music should play.

5      Answer:  Fox is without sufficient knowledge or information to form a belief as to the

6  allegations in Paragraph 31 concerning any particular Website visitor or a third party, and on that

7  basis denies them.  Fox denies all remaining allegations in Paragraph 31.

8       32.    In addition, the server's instructions cause the Trackers to be installed on a user's

9  browser. The Trackers then cause the browser to send identifying ("addressing") information to

10  PubMatic, Microsoft, and OpenX.

11      Answer:  Fox is without sufficient knowledge or information to form a belief as to the

12  allegations in Paragraph 32 concerning any particular Website visitor, and on that basis denies

13  them.  Fox denies all remaining allegations in Paragraph 32.

14       33.    The Third Parties' Trackers will also set a cookie corresponding with a user ID

15  unique to their Tracker that also allows the user to be tracked across the Internet and have their

16  information synced between multiple entities.

17      Answer:  Fox is without sufficient knowledge or information to form a belief as to the

18  allegations in Paragraph 33 concerning any particular Website visitor or the conduct of third

19  parties, and on that basis denies them.  Fox denies all remaining allegations in Paragraph 33.

20       34.    Because, as described below, the Trackers collect users' addressing, routing, or

21  signaling information—IP addresses, Device Metadata, and/or the unique user IDs—the Trackers

22  are pen registers.

23      Answer:  Fox is without sufficient knowledge or information to form a belief as to the

24  allegations in Paragraph 34 concerning any particular Website visitor or the conduct of third

25  parties, and on that basis denies them.  As to the allegations in Paragraph 34 that contain legal

26  conclusions, no response is required.  To the extent a response is required, Fox denies all remaining

27  allegations in Paragraph 34.

28

35.    Plaintiff and Class Members did not provide their prior consent to Defendants to install the Trackers on their browsers or use the Trackers. Nor did Defendants obtain a court order before installing or using the Trackers.

Answer:  Fox admits only that it did not obtain a court order in connection with Plaintiff's or Class Members' use of the Website, and it denies that it was required to do so.  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 35 concerning the conduct of Plaintiff and Class Members, and on that basis denies them.  As to the allegations in Paragraph 35 that contain legal conclusions, no response is required.  To the extent a response is required, Fox denies all remaining allegations in Paragraph 35.

A.    **The Mechanics And Privacy Implications Of IP Addresses**

36.    An IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132). The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced. IPv6 offers a vastly larger address space with 340 undecillion possible addresses. While IPv6 adoption has been increasing, many networks still rely on IPv4.[1]

Answer:  Paragraph 36 purports to rely on a source referenced in footnote 1, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 36, and on that basis denies them.

37.    Much like a telephone number, an IP address guides or routes an intentional communication signal (i.e., a data packet) from one device to another. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.

Answer:  Paragraph 37 consists of legal conclusions, to which no response is required.  To the extent a response is required, Fox denies all allegations in Paragraph 37.

---

[1]    See, e.g., *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

1    *1.    Differentiating Between Public Versus Private IP Addresses*

2    38.    A public IP address is accessible from anywhere on the internet; it is assigned by

3    an Internet Service Provider ("ISP") and it is unique globally. Public IP addresses are required for

4    devices that need direct internet access.

5    Answer:  Fox is without sufficient knowledge or information to form a belief as to the

6    allegations in Paragraph 38, and on that basis denies them.

7    39.    While public IP addresses are unique, they are not necessarily "public" in the sense

8    that they are freely accessible. If an individual is not actively sending data packets out, the public

9    IP address remains private and is not broadcast to the wider internet.

10   Answer:  Fox is without sufficient knowledge or information to form a belief as to the

11   allegations in Paragraph 39, and on that basis denies them.

12   40.    Public IP addresses can be used to determine the approximate physical location of

13   a device. For example, services like iplocation.io use databases that map IP addresses to

14   geographic areas—often providing information about the country, city, approximate latitude and

15   longitude coordinates, or even the internet service provider associated with the public IP. This

16   geolocation capability is leveraged by online advertising and user identification services.

17   Answer:  Fox is without sufficient knowledge or information to form a belief as to the

18   allegations in Paragraph 40, and on that basis denies them.

19   41.    A private IP address is used within an internal network and is not routable on the

20   public internet. The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of

21   numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255).

22   Thus, private IP addresses can be used repeatedly across different networks because they are

23   isolated from the global internet. For example, a home network in New York and an office network

24   in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without

25   conflict.

26   Answer:  Fox is without sufficient knowledge or information to form a belief as to the

27   allegations in Paragraph 41, and on that basis denies them.

28

42.     The distinction between a public and private IP address is fundamental to the architecture of modern networks. Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication. And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

Answer:  Fox denies that a public IP address "divulge[s] a user's geolocation."  Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 42, and on that basis denies them.

43.     An analogy is useful. A public IP address is like the number for a landline telephone for a household. A private IP address is like each handset that is connected to that landline number (e.g., "Handset #1," "Handset #2"). The public IP address determines the phone number who is making the call, which provides the most identifying information. On the other hand, knowing whether Handset #1 versus Handset #2 is making a call allows one to distinguish between members of the same household, although less can be gleaned from this fact on its own.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 43, and on that basis denies them.

44.     The same is true of IP addresses. The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large. On the other hand, while private IP addresses are not collected here, they would effectively distinguish whether a user is using their laptop or smartphone to access a website by itself.[2]

_____

[2] That being said, as discussed below, the Trackers also collect Device Metadata that distinguishes between devices accessing the same public IP address. So, by installing the Trackers on Website users' browsers, Defendants allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the Device Metadata).

**Figure 2:**



*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 44, footnote 2, and Figure 2, and on that basis denies them.

45.     Thus, the differences between public and private IP addresses are as follows:[3]

**Figure 3:**

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br><br>10.0.0.0 – 10.255.255.255,<br><br>172.16.0.0 – 172.31.255.255,<br><br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

Answer:  Paragraph 45 and Figure 3 purport to rely on a source referenced in footnote 3, which speaks for itself.  To the extent a response is required, Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 45, and on that basis denies them.

46.     A public IP address is therefore "routing, addressing, or signaling information."

Answer:  Paragraph 46 consists of a legal conclusion to which no response is required.  To the extent a response is required, Fox denies all allegations in Paragraph 46.

47.     A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

Answer:  Paragraph 47 consists of a legal conclusion to which no response is required.  To the extent a response is required, Fox denies all allegations in Paragraph 47.

48.     A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are

---

[3] *What's The Difference Between A Public And Private IP Address?* AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

ANSWER TO FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 25-cv-04253-AMO

communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[4]

    <u>Answer:</u> Paragraph 48 purports to quote a source referenced in footnote 4, which speaks for itself. As to the allegations in Paragraph 48 that contain legal conclusions, no response is required. Fox denies all remaining allegations in Paragraph 48.

        2.    *The Privacy Implications of Public IP Addresses*

    49.    Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined. Thus, knowing a user's public IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[5]

    <u>Answer:</u> Paragraph 49 purports to quote a source referenced in footnote 5, which speaks for itself. To the extent a response is required, Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 49, and on that basis denies them.

    50.    A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[6] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[7] Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a]

---

[4] Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

[5] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[6] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargetingstrategies/ (last accessed Feb. 18, 2025).

[7] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/c2ne77ua.

product or service"[8] because "[c]ompanies can use an IP address ... to personally identify individuals."[9]

Answer:  Paragraph 50 purports to quote a source referenced in footnotes 6, 7, 8, and 9, which speak for themselves.  To the extent a response is required, Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 50, and on that basis denies them.

51.    In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[10] For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[11]

Answer:  Paragraph 51 purports to quote a source referenced in footnote 10 and rely on a source referenced in footnote 11, which speak for themselves.  To the extent a response is required, Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 51, and on that basis denies them.

52.    "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting

---

[8] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[9] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[10] See, e.g., *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[11] *See*, *e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digitalmarketing-campaigns (last accessed Feb. 18, 2025).

1  technology works by matching physical addresses to IP addresses, allowing advertisers to serve

2  ads to specific households or businesses based on their location."[12]

3       Answer:  Paragraph 52 purports to quote a source referenced in footnote 12, which speaks

4  for itself.  To the extent a response is required, Fox is without sufficient knowledge or information

5  to form a belief as to the allegations in Paragraph 52, and on that basis denies them.  .

6       53.    "IP targeting capabilities are highly precise, with an accuracy rate of over 95%.

7  This means that advertisers can deliver highly targeted ads to specific households or businesses,

8  rather than relying on more general demographics or behavioral data."[13]

9       Answer:  Paragraph 53 purports to quote a source referenced in footnote 13, which speaks

10  for itself.  To the extent a response is required, Fox is without sufficient knowledge or information

11  to form a belief as to the allegations in Paragraph 53, and on that basis denies them.  .

12       54.    In addition to "reach[ing] their target audience with greater precision," businesses

13  are incentivized to use a customer's public IP address because it "can be more cost-effective than

14  other forms of advertising."[14] "By targeting specific households or businesses, businesses can

15  avoid wasting money on ads that are unlikely to be seen by their target audience."[15]

16       Answer:  Paragraph 54 purports to quote a source referenced in footnotes 14 and 15, which

17  speaks for itself.  To the extent a response is required, Fox is without sufficient knowledge or

18  information to form a belief as to the allegations in Paragraph 54, and on that basis denies them.  .

19       55.    In addition, "IP address targeting can help businesses to improve their overall

20  marketing strategy."[16] "By analyzing data on which households or businesses are responding to

21

22  ───────────────────
   [12]    *IP      Targeting*,     SAVANT     DSP,      https://www.savantdsp.com/ip-
   targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-
23  ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-
   5maUaAgtNEALw_wcB (last accessed Feb. 18, 2025).

24
   [13] *Id*.
25
   [14] Herbert Williams, *The Benefits of IP Address Targeting for Local Business*es, LINKEDIN (Nov.
26  29, 2023), https://tinyurl.com/42npz7nx.

27  [15] *Id*.

28  [16] *Id*.

their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[17]

Answer:  Paragraph 55 purports to quote a source referenced in footnotes 16 and 17, which speaks for itself.  To the extent a response is required, Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 55, and on that basis denies them.  .

56.    The collection of IP addresses here is particularly invasive here given that both PubMatic and OpenX are data brokers. As a report from NATO found:

> [a] data broker may receive information about a[] [website] user, including his … IP address. The user then opens the [website] while his phone is connected to his home Wi-Fi network. When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user. If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[18]

Answer:  Paragraph 56 purports to quote a source referenced in footnote 18, which speaks for itself.  To the extent a response is required, Fox denies that any of its conduct was "invasive." Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 56 that concern the conduct of third parties, and on that basis denies them.

57.    In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, data brokers like PubMatic and OpenX can use IP addresses to identify users append the IP address to a unique profile containing even more information about the user, specifically attaches IP addresses to comprehensive user profiles, and track Plaintiff and Class

---

[17] *Id.*

[18] Henrik Twetman & Gundars Bergmanis-Korats, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

Members across the Internet using their IP addresses and compiling vast reams of other personal information in the process.

Answer:  Fox denies that any of its conduct caused "harm" to Plaintiff or any Website visitors.  Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 57, and on that basis denies them.

58.    For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[19]

Answer:  Paragraph 58 purports to rely on two websites in footnote 19, which speak for themselves.  As to the allegations in Paragraph 58 that contain legal conclusions, no response is required.  To the extent a response is required, Fox denies all remaining allegations in Paragraph 58.

**B.    The Trackers Are "Pen Registers"**

59.    When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[20]

Answer:  Paragraph 59 purports to rely on and quote a source referenced in footnote 20, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 59 concerning what "companies" do when they build websites, and on that basis denies them.  To the extent a response is required, Fox denies all remaining allegations in Paragraph 59.

---

[19] *Is An IP Address Personal Data?* CONVESIO, https://convesio.com/knowledgebase/article/is-an-ipaddress-personal-data/ (last accessed Feb. 18, 2025); *see also What Is Personal Data?*, EUROPEAN          COMMISSION,          https://commission.europa.eu/law/law-topic/data-protection/reform/what-personaldata_en (last accessed Feb. 18, 2025).

[20] See *Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ (last accessed Feb. 18, 2025) ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

60.    Often times, third-party scripts are installed on websites "for advertising purposes."[21]

Answer:  Paragraph 60 purports to quote a source referenced in footnote 21, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 60 concerning what happens "often times" when companies build websites, and on that basis denies them.  Fox denies all remaining allegations in Paragraph 60.

61.    Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[22]

Answer:  Paragraph 61 purports to quote a source referenced in footnote 22, which speaks for itself.  To the extent a response is required, Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 61, and on that basis denies them.

62.    Defendants have long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website. Thus, when Plaintiff visited the Website, the Website's code—as programmed by Defendants—caused the Trackers to be installed on Plaintiff's and other users' browsers.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 62 concerning whether or when Plaintiff and Class Members visited the Website, and what happened during those purported visits, and on that basis denies them.  To the extent a response is required, Fox denies all remaining allegations in Paragraph 62.

63.    As described below, when a user visits the Website, the Website's code—as programmed by Defendants—installs the Trackers onto the user's browser. This allows the Third Parties—through their respective Trackers—to collect Plaintiff's and Class Members' IP addresses and Device Metadata, and pervasively track them across the Internet.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 63 concerning any particular Website visitor or third parties' conduct or

---

[21] *Id.*

[22] *Id.*

capabilities, and on that basis denies them.  To the extent a response is required, Fox denies all remaining allegations in Paragraph 63.

64.    The Trackers also cause additional data points to be sent from Plaintiff's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices. In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods. Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies. Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 64 concerning whether or when Plaintiff and Class Members visit the Website, and what happens during those purported visits, and on that basis denies them.  Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 64, and on that basis denies them.

65.    Defendants and the Third Parties then use the public IP addresses, Device Metadata, and other information of the Website's visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hypertargeted advertisements, and unjustly enrich themselves through this improperly collected information.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 65 concerning third parties' conduct, and on that basis denies them.  Fox denies all remaining allegations in Paragraph 65.

66.    At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members' browsers, or prior to the use of the Trackers, did Defendants procure Plaintiff's and

1  Class Members's consent for such conduct. Nor did Defendants obtain a court order to install or

2  use the Trackers.

3      <u>Answer:</u>  Fox admits only that it did not obtain a court order in connection with Plaintiff's

4  or Class Members' use of the Website, and it denies that it was required to do so.  Fox denies all

5  remaining allegations in Paragraph 66.

6      *1.*    *The PubMatic Tracker And Its Cookie-Syncing, Data Broker Partners On*

7      *The Fox News Website*

8      67.    PubMatic is a software-as-a-service company that develops the PubMatic Tracker,

9  which it provides to website owners like Defendants for a fee. PubMatic is a registered data broker

10  in California.[23]

11      <u>Answer:</u>  Fox admits only that PubMatic may charge fees to website owners for certain

12  PubMatic services.  To the extent Paragraph 67 purports to rely on a source referenced in footnote

13  23, the source speaks for itself.  Fox denies all remaining allegations in Paragraph 67.

14      68.    According to PubMatic, it is "one of the world's leading scaled digital advertising

15  platforms" and "offer[s] more transparent advertising solutions to publishers, media buyers and

16  data owners, allowing [their clients] to harness the power and potential of the open internet to drive

17  better business outcomes."[24]

18      <u>Answer:</u>  Paragraph 68 purports to quote a source referenced in footnote 24, which speaks

19  for itself.

20      69.    As described in more detail below, PubMatic is a "supply side platform" that

21  enables companies like Defendants to sell their user inventory to advertisers, thereby earning

22  revenue and monetizing data. To achieve this, PubMatic uses its Tracker to receive, store, and

23  analyze information collected from website visitors, such as visitors of Defendants' Fox News

24  Website.

25

26  [23] *Data Broker Registration for PubMatic, Inc.*, Office of the Attorney General, https://oag.ca.gov/data-broker/registration/186702 (last accessed Feb. 18, 2025).

27  [24] *The Supply Chain Of The Future. Delivered*, PubMatic, https://pubmatic.com/about-us (last

28  visited Feb. 18, 2025).

1    Answer:  Fox is without sufficient knowledge or information to form a belief as to the

2    allegations in Paragraph 69 concerning a third party, and on that basis denies them.  Fox denies all

3    remaining allegations in Paragraph 69.

4    70.    The first time a user visits Defendants' Fox News Website, the user's browser sends

5    an HTTP request to Defendants' server, and Defendants' server sends the HTTP response. This

6    response also includes directions to install the PubMatic Tracker on the user's browser. The

7    PubMatic Tracker, in turn, allows PubMatic to collect and record the user's IP address and Device

8    Metadata. (See Figure 4, *infra*) (relevant portions highlighted in red boxes).[25]

9    Answer:  Fox is without sufficient knowledge or information to form a belief as to the

10   allegations in Paragraph 70 concerning any particular Website visitor, and on that basis denies

11   them.  Fox is also without sufficient knowledge or information to form a belief concerning the

12   allegation in footnote 25 that the redacted IP addresses in the FAC belong to Plaintiff, and on that

13   basis denies them.  Fox denies all remaining allegations in Paragraph 70.

14   71.    Indeed, PubMatic admits only that its Tracker "automatically collects" "Browser

15   and Device Information, such as the IP address you use to connect to an online service; device

16   type and model; manufacturer; operating system type and version (*e.g.*, iOS or Android); web

17   browser type and version (*e.g.*, Chrome or Safari); user-agent; carrier name; time zone; network

18   connection type (*e.g.*, Wi-Fi or cellular); and information about our Publisher's apps and versions

19   currently active on a device."[26]

20   Answer:  Paragraph 71 purports to quote a source referenced in footnote 26, which speaks

21   for itself.  Fox is without sufficient knowledge or information to form a belief as to the remaining

22   allegations in Paragraph 71, and on that basis denies them.

---

[25] All but the first two digits of Plaintiff's IP addresses have been redacted throughout this Complaint to protect their privacy.

[26] ADVERTISER PLATFORM PRIVACY POLICY, https://pubmatic.com/legal/privacy-policy/#userinfowecollect

72.     The PubMatic Tracker also stores a cookie along with the user's Device Metadata in the user's browser cache. When the user subsequently visits Defendants' Fox News Website, the PubMatic Tracker locates the cookie identifier stored on the user's browser. If the cookie is stored on the browser, the PubMatic Tracker causes the browser to send the cookie (the unique identifier, "KADUSERCOOKIE" in Figure 4 below) along with the user's IP address and Device Metadata to PubMatic. The KADUSERCOOKIE is specifically used to "uniquely identify each browser or device from which an individual user visits our partners' websites."[27]

**Figure 4:**



Answer:  Paragraph 72 purports to quote sources referenced in footnotes 26 and 27, which speak for themselves.  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 72 concerning any particular Website visitor or a third party, and on that basis denies them.  Fox is also without sufficient knowledge or information to form a belief as to whether Figure 4 depicts the "KADUSERCOOKIE" or any information related to the "KADUSERCOOKIE," and on that basis denies the allegations.   Fox denies all remaining allegations in Paragraph 72.

---

[27]  PLATFORM   COOKIE   &   OTHER   SIMILAR   TECHNOLOGIES   POLICY, https://pubmatic.com/legal/platform-cookie-policy/

73. Using the KADUSERCOOKIE, IP address, and Device Metadata, PubMatic can track and identify Fox News Website users across the Internet. A general diagram of this process is pictured as Figure 5, which explains how the Fox News Website causes the PubMatic Tracker to install a cookie on the user's browser and instructs the user's browser to send the user's Device Metadata along with the cookie.

**Figure 5:**



Answer: Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 73, and on that basis denies them.

74. If the user clears his or her cookies, then the user wipes out the PubMatic Tracker from its cache. Accordingly, the next time the user visits the Fox News Website, the process begins over again: (i) Defendants' server installs the PubMatic Tracker on the user's browser, (ii) the PubMatic Tracker instructs the browser to send PubMatic the user's IP address and Device Metadata, (iii) the PubMatic Tracker stores a cookie in the browser cache, and (iv) PubMatic will continue to receive the user's IP address Device Metadata on subsequent Fox News Website visits with the cookie transmission.

Answer: Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 74 concerning any particular internet user or Website visitor, and on that basis denies them.

75.    In all cases, however, PubMatic receives a user's Device Metadata (the "user-agent" string in the screenshots below) and unique user ID every time its Tracker is loaded by the Fox News Website, as the above screenshot of traffic from Plaintiff Echeverria-Corzan's browser indicate. (See Figure 4, supra).

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 75 concerning any particular Website visitor, and on that basis denies them.  Fox is also without sufficient knowledge or information to form a belief as to whether Figure 4 depicts "traffic from Plaintiff Echeverria-Corzan's browser" as alleged in Paragraph 75, and on that basis denies the remaining allegations.

76.    The PubMatic Tracker also calls other third parties to the Fox News Website and shares the user's KADUSERCOOKIE value with these other third parties. The explicit purpose of this process—which is called "cookie syncing" and is alleged in more detail below—is to identify the user by matching that user with any profiles PubMatic and/or these other third parties may have on the user, which are then provided by PubMatic for sale to advertisers.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 76, and on that basis denies them.

77.    For instance, the PubMatic Tracker calls the Tapad Pixel to the Fox News Website and syncs its KADUSERCOOKIE with Tapad, as the below screenshot indicates. The "referrer" header shows PubMatic is bringing in Tapad, and the value of the "partner_device_id" parameter matches the value of the KADUSERCOOKIE parameter in Figure 4. Finally, Tapad is enhancing this user information by installing its own cookie on the user's browser, something indicated by the path of the GET request, "idsync." This is pictured in the screenshot below from Plaintiff Echeverria-Corzan's browser:

**Figure 6:**



Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 77 that concern the conduct of third parties, and on that basis denies them. Fox is also without sufficient knowledge or information to form a belief as to the allegations in Paragraph 77 that Figure 6 indicates "that the PubMatic Tracker calls the Tapad Pixel to the Fox News Website and syncs its KADUSERCOOKIE with Tapad"; that "the 'referrer' header shows PubMatic is bringing in Tapad"; that "the value of the 'partner_device_id' parameter matches the value of the KADUSERCOOKIE parameter in Figure 4"; and that "the path of the GET request, 'idsync'" as depicted in Figure 6 "indicates" that "Tapad is enhancing this user information by installing its own cookie on the user's browser," and on that basis denies the allegations.  Fox denies all remaining allegations in Paragraph 77.

78.    Tapad is a registered data broker in California[28] and is owned by Experian,[29] another registered data broker.[30] The purpose of the Tapad Pixel, especially in conjunction with Experian's services, is to perform identity resolution. As Experian describes it:

> [i]dentity resolution matches fragmented identifiers to a single profile. This creates a unified, cross-channel view of a consumer that helps marketers understand a customer's demographics, lifestyle, interests, and where and how they engage with your brand. Identity resolution improves campaign targeting and enables marketers to deliver personalized marketing messages.[31]

Answer:  Paragraph 78 purports to rely on sources referenced in footnotes 28, 29, and 30, and to quote a source referenced in footnote 31, all of which speak for themselves.  Fox denies all remaining allegations in Paragraph 78.

79.    Tapad identifies users by "crunching 150 billion data points—from cookies, cellphone IDs (which link individual phones to app downloads and Web browsing), Wi-Fi connections, website registrations, browsing history and other inputs."[32] Tapad then aggregated these inputs into what it called a "Device Graph," which allows advertisers to connect individuals to all the devices those individuals use for the purpose of delivering targeted advertisements.[33]

Answer:  Paragraph 79 purports to quote a source referenced in footnote 32 and rely on a source referenced in footnote 33, both which speak for themselves.  Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 79, which concern third parties, and on that basis denies them.

---

[28]  DATA BROKER REGISTRATION FOR TAPAD, INC., https://oag.ca.gov/data-broker/registration/187511.

[29]  Allison Schiff, *Telenor Sells Tapad to Experian for $280 Million*, ADEXCHANGER (Nov. 19, 2020), https://www.adexchanger.com/privacy/telenor-sells-Tapad-to-experian-for-280-million/.

[30]  DATA BROKER REGISTRATION FOR EXPERIAN INFORMATION SOLUTIONS, INC., https://oag.ca.gov/data-broker/registration/186691.

[31]  https://www.experian.com/marketing/consumer-sync/identity-resolution.

[32]  *Id.*

[33]  https://techcrunch.com/2016/02/01/telenor-jumps-into-ad-tech-acquires-Tapad-for-360m/.

80.    Tapad integrates with Experian's "offline consumer data set (purchase behaviors, interests, lifestyle info)."[34] This includes "first-party data such as names, physical addresses, email addresses, mobile ad identifiers (MAIDs), IP addresses, and other information."[35]

<u>Answer:</u>  Paragraph 80 purports to quote a source referenced in footnotes 34 and 35, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 80, which concern third parties, and on that basis denies them.

81.    As another example, the PubMatic Tracker calls the Dotomi Pixel (which is operated by Epsilon) to the Website and syncs its KADUSERCOOKIE with Epsilon, as the below screenshot indicates. The "referrer" header shows PubMatic is bringing in the Dotomi Pixel, and the value of the "nuid" parameter matches the value of the KADUSERCOOKIE parameter in Figure 4. Indeed, the "pubmatic-match.dotomi.com" value leaves little doubt that PubMatic is matching its cookies with the Dotomi Pixel to obtain any information Epsilon has about the user. Finally, Epsilon is enhancing this user information by installing its own cookie on the user's browser. This is pictured in the screenshot below from Plaintiff Echeverria-Corzan's browser:

**Figure 7:**



---

[34] *Id.*

[35] *Id.* (cleaned up).

<u>Answer</u>:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 81 that concern the conduct of third parties, and on that basis denies them. Fox is also without sufficient knowledge or information to form a belief as to the allegations in Paragraph 81 that Figure 7 indicates that "[t]he 'referrer' header shows PubMatic is bringing in the Dotomi Pixel"; that "the value of the 'nuid' parameter matches the value of the KADUSERCOOKIE parameter in Figure 4"; or that "Epsilon is enhancing this user information by installing its own cookie on the user's browser," and on that basis it denies all allegations. Fox denies all remaining allegations in Paragraph 81.

82.    The Dotomi Pixel is operated by Epsilon, another registered data broker in California.[36] Epsilon is a global advertising and marketing technology company and "is the only digital advertising services partner that connects every display, online video, connected TV and audio impression to a real person."[37]

<u>Answer</u>:  Paragraph 82 purports to rely on a source referenced in footnote 36 and quote a source referenced in footnote 37, both of which speak for themselves.  Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 82, which concern third parties, and on that basis denies them.

83.    Epsilon recognizes that its clients want "[t]o move potential customers from awareness to action" and thus "need to know who [the clients are] reaching."[38] Thus, with Epsilon's "CORE ID, the industry's only identity solution using all available online and offline identifiers, brands can reach the right person across their favorite content on any device."[39]

---

[36] DATA BROKER REGISTRATION FOR EPSILON DATA MANAGEMENT, LLC, https://oag.ca.gov/databroker/registration/186453.

[37] *Epsilon Digital*, EPSILON, https://www.epsilon.com/us/products-and-services/epsilon-digital.

[38] *Epsilon Digital | Online Video*, EPSILON, https://www.epsilon.com/us/products-andservices/epsilon-digital/online-video.

[39] *Id.*

1    <u>Answer:</u>  Paragraph 83 purports to quote a source referenced in footnotes 38 and 39, which

2   speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the

3   remaining allegations in Paragraph 83, which concern third parties, and on that basis denies them.

4    84.    Epsilon boasts that it has "[u]nrivaled accuracy at an individual level" because its

5   technology requires a "complete name and address validated by transactions" to "ensure marketers

6   reach the right person with maximum precision and efficiency."[40] "The CORE ID graph of 200M+

7   U.S. consumers is the only solution grounded in offline names and address. This allows us to

8   enable omnichannel people-based activation, measurement and waste reduction."[41]

9    <u>Answer:</u>  Paragraph 84 purports to quote a source referenced in footnotes 40 and 41, which

10   speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the

11   remaining allegations in Paragraph 84, which concern third parties, and on that basis denies them.

12    85.    Epsilon advertisers it procures consumers' identities from "public records

13   (including voter registration files, phone books, deeds, and permits), surveys ('self-reported data

14   from 20 million households'), partners (data from corporate sources), and 'multi-sourced'

15   information, which it describes as 'real transactional data' on categories of purchases."[42] Thus,

16   Epsilon provides all of this information to PubMatic when PubMatic syncs its

17   KADUSERCOOKIE with the Dotomi Pixel.

18    <u>Answer:</u>  Paragraph 85 purports to quote a source referenced in footnote 42, which speaks

19   for itself.  Fox is without sufficient knowledge or information to form a belief as to the allegations

20   in Paragraph 85, which concern third parties, and on that basis denies them.

---

[40] *Identity: CODE ID*, EPSILON, https://www.epsilon.com/us/products-and-services/identity-core-id.

[41] *Id.*

[42] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, 7 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://tinyurl.com/hy9fewhs.

86.     As a final example, PubMatic also brings into the Website the RLCDN Pixel, which is owned and operated by LiveRamp, another registered data broker in California.[43] Again, the PubMatic Tracker syncs its KADUSERCOOKIE with LiveRamp, as the below screenshot indicates. The "referrer" header shows PubMatic is bringing in the RLCDN Pixel, and the value of the "partner_uid" parameter matches the value of the KADUSERCOOKIE parameter in Figure 4. Indeed, the "idsync.rlcdn.com" value leaves little doubt that PubMatic is matching its cookies with the RLCDN Pixel to obtain any information LiveRamp has about the user. Finally, LiveRamp is enhancing this user information by installing its own cookie on the user's browser. This is pictured in the screenshot below from Plaintiff Echeverria-Corzan's browser:

**Figure 8:**



Answer: Paragraph 86 purports to rely on a source referenced in footnote 43, which speaks for itself. Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 86 that concern the conduct of third parties, and on that basis denies them. Fox is also without sufficient knowledge or information to form a belief as to the allegations in Paragraph 86 that Figure 8 is "from Plaintiff Echeverria-Corzan's browers;" that it indicates that "PubMatic

---

[43] DATA BROKER REGISTRATION FOR LIVERAMP, INC., https://oag.ca.gov/data-broker/registration/560496.

Tracker syncs its KADUSERCOOKIE with LiveRamp"; that "[t]he 'referrer' header shows PubMatic is bringing in the RLCDN Pixel, and the value of the 'partner_uid' parameter matches the value of the KADUSERCOOKIE parameter in Figure 4"; or that "LiveRamp is enhancing this user information by installing its own cookie on the user's browser," and on that basis it denies all allegations. Fox denies all remaining allegations in Paragraph 86.

87. Among other services, LiveRamp provides "identity resolution," which "[b]ring in data from across identity spaces" "to enable the delivery of more personalised and meaningful customer experiences."[44]

Answer: Paragraph 87 purports to quote a source referenced in footnote 44, which speaks for itself. Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 87, which concern third parties, and on that basis denies them.

88. LiveRamp does this through its "LiveRamp Identity Graph," which "is a people-based map connecting de-identified offline touchpoints and online devices" that (i) "[r]esolv[es] separate emails, postal addresses, and phone numbers to a single individual"; (ii) "[m]atch[es] disparate devices to people-based pseudonymous identifiers"; and (iii) "[m]erg[es] these offline and online identity spaces into a unified … people-based ID space."[45]

Answer: Paragraph 88 purports to quote a source referenced in footnote 45, which speaks for itself. Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 88, which concern third parties, and on that basis denies them.

89. This is a non-exhaustive list of the entities with whom PubMatic syncs its user cookies. Suffice it to say, PubMatic is syncing its user cookie with numerous registered data brokers to collect as much information about a user as possible and de-anonymize the user, all of which is used for advertising purposes.

---

[44] *Identity Resolution*, LIVERAMP, https://liveramp.uk/identity-resolution/.

[45]     RAMPID     METHODOLOGY,     https://docs.liveramp.com/identity/en/rampid-methodology.html

1    <u>Answer</u>:  Fox is without sufficient knowledge or information to form a belief as to the

2    allegations in Paragraph 89, which concern third parties, and on that basis denies them.

3    90.    The PubMatic Tracker is at least a "process" because it is "software that identifies

4    consumers, gathers data, and correlates that data." (*Greenley, supra*, 684 F. Supp. 3d at 1050.)

5    <u>Answer</u>:  Paragraph 90 consists of legal conclusions and characterizations to which no

6    response is required.  To the extent a response is required, Fox denies all allegations in Paragraph

7    90.

8    91.    Further, the PubMatic Tracker is a "device" because "in order for software to work,

9    it must be run on some kind of computing device." (See, e.g., *James v. Walt Disney Co.* (N.D. Cal.

10   2023) 701 F. Supp. 3d 942, 952.)

11   <u>Answer</u>:  Paragraph 91 consists of legal conclusions and characterizations to which no

12   response is required.  To the extent a response is required, Fox denies all allegations in Paragraph

13   91.

14   92.    Because the PubMatic Tracker captures the outgoing information—the IP address,

15   Device Metadata, and unique user IDs—from visitors to the Fox News Website, it is a "pen

16   register" for the purposes of CIPA § 638.50(b). The PubMatic Tracker is also a "pen register"

17   because its KADUSERCOOKIE is used to ascertain the identity of the user communicating with

18   the Fox News Website, and thus constitutes "addressing" information.

19   <u>Answer</u>:  Paragraph 92 purports to quote Cal. Penal Code § 638.50(b), which speaks for

20   itself.  As to the allegations in Paragraph 92 that contain legal conclusions and characterizations,

21   no response is required.  To the extent a response is required, Fox denies all allegations in

22   Paragraph 92.

23        2.    *The ADNXS Tracker And Its Cookie-Syncing Data Broker Partners On The*

24              *Fox News Website*

25   93.    Microsoft is a technology company with software-as-a-service products, such as

26   Microsoft Advertising. Microsoft owns and operates the ADNXS Tracker, which it provides to

27   website owners like Defendants for a fee.

28

1    Answer:  Fox admits only that website owners may be charged fees for certain ADNXS

2    services.  Fox is without sufficient knowledge or information to form a belief as to the allegations

3    in Paragraph 93 that concern a third party, and on that basis denies them.  Fox denies all remaining

4    allegations in Paragraph 93.

5    94.    According to Microsoft, "[w]ith an integrated platform advantage and a focus on

6    data-driven performance, [Microsoft] enables you to engage audiences on all screens and drive

7    business results."[46]

8    Answer:  Paragraph 94 purports to quote a source referenced in footnote 46, which speaks

9    for itself.  To the extent a response is required, Fox denies all remaining allegations in Paragraph

10   94.

11   95.    As described in more detail below, Microsoft is a "demand side platform" that

12   facilities the selling of Defendants' Website users to interested advertisers, who will bid to show

13   those users advertisements targeted to their identity and location. This process enables Defendants

14   to monetize their Website. To achieve this, Microsoft uses its Tracker to receive, store, and analyze

15   information collected from website visitors, such as visitors of Defendants' Website.

16   Answer:  Fox is without sufficient knowledge or information to form a belief as to the

17   allegations in Paragraph 95 concerning any particular Website visitor or third parties, and on that

18   basis denies them.  Fox denies all remaining allegations in Paragraph 95.

19   96.    The first time a user visits Defendants' Website, the user's browser sends an HTTP

20   request to Defendants' server, and Defendants' server sends an HTTP response with directions to

21   install the ADNXS Tracker on the user's browser. The ADNXS Tracker, in turn, allows Microsoft

22   to collect and record the user's IP address and Device Metadata.

23   Answer:  Fox is without sufficient knowledge or information to form a belief as to the

24   allegations in Paragraph 96 concerning any particular Website visitor or a third party, and on that

25   basis denies them.  Fox denies all remaining allegations in Paragraph 96.

26   _____

27   [46]    *Microsoft    Invest*,    Microsoft    Advertising,
     https://about.ads.microsoft.com/en/solutions/technology/microsoft-invest-dsp#accordion-

28   b751e6297a-item-73282c0a03 (last accessed Feb. 18, 2025).

97.     Moreover, Microsoft stores a cookie with the user's IP address and Device Metadata in the user's browser cache. When the user subsequently visits Defendants' Website, the ADNXS Tracker locates the cookie identifier stored on the user's browser. If the cookie is stored on the browser, the ADNXS Tracker causes the browser to send the cookie (the unique identifier, "uuid2" in the screenshot below) along with the user's IP address and Device Metadata to Microsoft. Using the cookie, IP addresses, and Device Metadata, Microsoft can track and identify Website users across the Internet. A general diagram of this process is pictured in Figure 5, which explains how the Website cause the ADNXS Tracker to install a cookie on the user's browser and instructs the user's browser to send the user's IP address and Device Metadata along with the cookie.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 97 and Figure 5 concerning any particular Website visitor or a third party's conduct and capabilities, and on that basis denies them.  Fox is also without sufficient knowledge or information to form a belief as to whether Figure 5 accurately depicts the "process" that Plaintiff alleges it does in Paragraph 97.  Fox denies all remaining allegations in Paragraph 97.

98.     If the user clears his or her cookies, then the user wipes out the ADNXS Tracker from its cache. Accordingly, the next time the user visits Defendants' Website the process begins over again: (i) Defendants' server installs the ADNXS Tracker on the user's browser, (ii) the ADNXS Tracker instructs the browser to send Microsoft the user's IP address and Device Metadata, (iii) the ADNXS Tracker stores a cookie in the browser cache, and (iv) Microsoft will continue to receive the user's IP address and Device Metadata on subsequent Website visits as part of the cookie transmission.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 98 concerning any particular internet user or Website visitor or the conduct of a third party, and on that basis denies them.  Fox denies all remaining allegations in Paragraph 98.

99.     In all cases, however, Microsoft receives a user's IP address, Device Metadata, and user information every time its Tracker is loaded by the Website, as the below screenshots of traffic from Plaintiff's browser indicate (relevant portions highlighted in red boxes). (See Figure 9 [Plaintiff Echeverria-Corzan's browser].)

**Figure 9:**



Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 99 concerning any particular Website visitor or the conduct of a third party, and on that basis denies them.  Fox is also without sufficient knowledge or information to form a belief as to whether Figure 9 depicts "traffic from Plaintiff's browser" or "Plaintiff

1    Echeverria-Corzan's browser" as alleged in Paragraph 99, and on that basis denies the allegations.

2    Fox denies all remaining allegations in Paragraph 99.

3         100.    The ADNXS Tracker also calls other third parties to the Website and shares the

4    user's uuid2 value with these other third parties. The explicit purpose of this process is to identify

5    the user by matching that user with any profiles Microsoft and/or these other third parties may

6    have on the user, which are then provided by Microsoft for sale to advertisers.

7         Answer:  Fox is without sufficient knowledge or information to form a belief as to the

8    allegations in Paragraph 100 that concern any particular Website visitor or the conduct of third

9    parties, and on that basis denies them.  Fox denies all remaining allegations in Paragraph 100.

10        101.    For instance, the ADNXS Tracker calls the AGKN Tracker to the Website and

11   syncs its uuid2 cookie with the AGKN Tracker, as the below screenshot of traffic from Plaintiff

12   Echeverria-Corzan's browser indicates. The "referrer" header shows ADNXS Tracker is bringing

13   in the AGKN Tracker, and the value of the "adnxsid" parameter matches the value of the uuid2

14   parameter in Figure 9. Finally, the AGKN Tracker is enhancing this user information by installing

15   its own cookie on the user's browser:

16   **Figure 10:**



24        Answer:  Fox is without sufficient knowledge or information to form a belief as to the

25   allegations in Paragraph 101 that concern any particular Website visitor or the conduct of third

26   parties, and on that basis denies them.  Fox is also without sufficient knowledge or information to

27   form a belief as to the allegations in Paragraph 101 that Figure 10 indicates that "the ADNXS

28

Tracker calls the AGKN Tracker to the Website and syncs its uuid2 cookie with the AGKN Tracker"; that "[t]he 'referrer' header shows ADNXS Tracker is bringing in the AGKN Tracker"; or that "the value of the 'adnxsid' parameter matches the value of the uuid2 parameter in Figure 9," and on that basis it denies all allegations. Fox denies all remaining allegations in Paragraph 101.

102. AGKN is short for Aggregate Knowledge, which was purchased by Neustar in 2013. Neustar is a registered Data Broker in California, and is "a global information services and technology company specializing in real-time identity resolution and data analytics" that "helps businesses identify and verify customer identities." [47] Neustar, in turn, was purchased by TransUnion in 2021, who is also a registered data broker in California. [48] Thus, Neustar's services, including the AGKN Tracker, are now owned, operated, and integrated with TransUnion.

Answer: Paragraph 102 purports to quote from a source referenced in footnote 47 and rely on a source referenced in footnote 48, both of which speak for themselves. Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 102, which concern third parties, and on that basis denies them.

103. Neustar's services, as integrated with TransUnion's, enable advertisers to target specific people. This is done through TruAudience Identity Solutions, which "[e]stablish a single view of each customer across offline and online touchpoints with advanced identity resolution and data enrichment capabilities."[49] Indeed, TruAudience "[e]nhance[s] your view of the customer with fresh contact information and predictive demographic data for insights, audience building, and engagement," which can be compiled into a "first-party identity graph to power prospecting, media monetization, or agency operations."[50]

---

[47] WHAT IS NEUSTAR?, https://docs.metarouter.io/docs/neustar.

[48] DATA BROKER REGISTRATION FOR TRANSUNION DIGITAL LLC, https://oag.ca.gov/data-broker/registration/562235.

[49] TRUAUDIENCE IDENTITY SOLUTIONS, https://www.transunion.com/solution/truaudience/identity.

[50] Id.

<u>Answer</u>: Paragraph 103 purports to quote from a source referenced in footnotes 49 and 50, which speaks for itself. Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 103, which concern third parties, and on that basis denies them.

104.    TruAudience also allows website operators like Defendants to "[c]reate audiences using your first-party data, third-party audiences, and/or TransUnion's marketing attributes." Defendants can then "[m]ake the most of [its] first party data assets with advanced identity resolution and audience building capabilities, alongside a broad distribution network," and "[a]ccess audiences from trusted third-party data providers to reach your ideal customers across all verticals."[51] This includes "[u]sing TransUnion data,"[52] which is obviously extensive.

<u>Answer</u>: Paragraph 104 purports to quote from a source referenced in footnotes 51 and 52, which speaks for itself. Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 104 that concern third parties, and on that basis denies them. Fox denies all remaining allegations in Paragraph 104.

105.    The ADNXS Tracker also sets another cookie—the "UIDS" cookie—on Website users' browsers. (See Figure 11 [Plaintiff Echeverria-Corzan's browser].)

---

[51] AUDIENCE SOLUTIONS, https://www.transunion.com/solution/truaudience/audiences. For clarity, "[f]irst-party data is collected directly from a company's own customers through platforms like websites, mobile apps, or physical stores … Third-party data is procured from external data brokers and aggregators, providing information about consumers but without a direct relationship between the data collector and the consumer." Derek Andersen, *What Marketers Need to Know About 1st, 2nd, and 3rd-Party Data*, INVOCA BLOG (Mar. 3, 2025), https://www.invoca.com/blog/marketersneed-to-know-first-second-third-party-data.

[52] *Id.*

**Figure 11:**

| Code | Method | Host | Path | Start | Duration | Size | Status | Info |
|------|--------|------|------|-------|----------|------|--------|------|
| | POST | ib.adnxs.com | /ut/v3/prebid | 14:39:59.884 | 370 ms | 816 bytes | Complete | |

Overview  Contents  Summary  Chart  Notes

Filter:

| Name | Value |
|------|-------|
| uuid2 | 3568626746186405980 |
| XANDR_PANID | kvo6DJpd931IvCNrThNwFwxnuYOzgf4ooCpe42XQU57LOgswN17opumflJT12OB7WqG7xPzfyj4FCqZPq_z6K6ooOCDJilPO5ZgSv7RJYo. |
| receive-cookie-deprecation | 1 |
| uersync | eNqdmMtOHEEMRf-I17Pwq6pdIWKoojMAokkAYiCUCPHvaFkgEdVidd0tw5Hta7cf9bz80O9ebu7vlis-LQ83PB-3i-Xq0_Ny8225stNy-XV3_eXy9PXxaf2HphHCHenf36_vvz_cnp_O608vp79mLfI8l2UWFR5JMTAio6RN... |
| anj | dTM7kfM40-@MN'eF/WMsi-*fOjVQmmiCiaRjQ5iJwZoYRoT+KvXsFQ/+5#JvpIHR"<$8Zg7JMMsZ2_$zf6EETm.+Qs9LiE4+3p6pP(/0mjE3VJAUh93b05mVHM-bCMo^jdKsOqVL4$x0hmM%)0K6X%;juvvHypXtt... |
| uids | eyJOZW1wiVUIEcyl6eyJhYXg[OnsidWIk\joiMj4Nj4(EzAzAyMTQyMzAyOTAwMFYxMClslmV4cGlyZMQiOiIyMDl1LTAzLTE4VDExOjA5OjEzWi9LCbz0YiOnsidWIk\joiNjQxODc4MzgwNDcwMTUzMjM2NSIslmV4cGlyZMQiOiJyMDI1LTA1LTI2VDE5OjM4Oj13WiJ9fQ== |

**Answer:** Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 105 that concern any particular Website visitor or a third party, and on that basis denies them. Fox is also without sufficient knowledge or information to form a belief as to whether Figure 11 depicts "Plaintiff Echeverria-Corzan's browser." Fox denies all remaining allegations in Paragraph 105.

106. The "UIDS" value is encoded in Base64, which can be easily decoded on publicly available websites.[53] Decoding the UIDS values for Plaintiff yields an assortment of user IDs for other third parties that the ADNXS Tracker is syncing with, which are then permanently stored with the cookie on the users' browsers. This allows Microsoft to identify the user based on other third party identifiers, and this value is constantly updated as Microsoft syncs with further third parties. (See Figure 12 [Plaintiff Echeverria-Corzan].)

---

[53] See, e.g., https://www.base64decode.org/.

ANSWER TO FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 25-cv-04253-AMO

**Figure 12:**

{"tempUIDs":{"aax":{"uid":"2986133021423029000V10","expires":"2023-03-18T11:09:13Z"},"adf":{"uid":"6418783804701532365","expires":"2025-05-26T19:38:57Z"},"adkernelAdn":{"uid":"A806064858831077621 9","expires":"2024-12-09T21:05:29Z"},"adman":{"uid":"e9f3a8 1f-d7fa-45a3-afd9-536b81fb5f10","expires":"2023-08-20T21:50:09Z"},"adnxs":{"uid":"3568626746186405980","expires":"2025-02-15T1 1:59:29.794957134Z"},"adtelligent":{"uid":"7c81e0306f28f13d","expires":"2025-05-26T19:39:08Z"},"adyoulike":{"uid":"fec78e7194cca84e 44956fa0c415047b","expires":"2025-05-19T23:12:58Z"},"connectad":{"uid":"9ddc7d60-e033-47f0-b77a-4c185f873f54","expires":"2025-0 220T09:47:18Z"},"conversant":{"uid":"AQEHe28YvHiayQFBJv56AQEBAQE","expires":"2024-06-29T00:36:30Z"},"deepintent":{"uid":"[UI D]","expires":"2023-02-17T03:11:42Z"},"eplanning":{"uid":"AJvgaOimll9TP81b","expires":"2025-05-02T12:09:32Z"},"impactify":{"uid":"eyJ 0ZW1wVUlEcyI6eyJhZGZvcm0iOnsidWlkljoiNjQxODc4MzgwNDcwMTUzMjM2NSIsImV4cGlyZXMiOilyMDlyLTExLTA0VDExOjl2OjEzLj EyMzA5Nji5NloifSwiYWRueHMiOnsidWlkljoiMzU2ODYyNjc0NjE4NjQwNTk4MClsImV4cGlyZXMiOilyMDlyLTExLTA0VDExOjl2OjEyLjg 2NTM2NjlwNVoifSwiaW1wcm92ZW?2l0YWwiOnsidWlkljoiODAyMzcxYTEtMWExZS00MTZkLWIzOTEtOWI5OGY5NzZiNGUziwiZX hwaXJlcyI6IjIwMjItMTEtMDRUMTE6MjY6MTAuMzUwMjYxMjQzWJ9LCJydWJpY29uljp7InVpZCI6lkw0RVY0VTQxLTFELUI4VEsiLCJle HBpcmVzIjoiMjAyMi0xMS0wNFQxMToyNjoxMi43MjI0MDc2MjhaIn0sInNtYXJ0YYRzZXJ2ZXIiOnsidWlkljoiODM4Mjk5NzM2ODU4NzQy ODk3MSIsImV4cGlyZXMiOilyMDlyLTExLTA0VDExOjl2OjExLjU4MTY2ODQ2OVoifSwieWFob2li8iOnsidWlkljoieS0uaW1MM1ZKRTJ1SD Zpa3FIVVVMZ2NFUThic1Jab3lzOHouWUxxNzQtfkEiLCJleHBpcmVzIjoiMjAyMi0xMS0wNFQxMToyNjoxMi4zODQ5NTQ4aiIn0","expires":"2023-01-19T11:26:13Z"},"krushmedia":{"uid":"b4ba35cc-4 e9e-40b9-b935-d409975f606c","expires":"2023-08-23T04:32:25Z"},"logicad":{"uid":"AUeAL_9KaZIgks8AED1M5M64O88AAAGUWbrg7 Q","expires":"2025-04-12T08:56:47Z"},"medianet":{"uid":"330308406142309000V10","expires":"2024-09-05T23:49:41Z"},"quantumde x":{"uid":"920d619d-f201-4e4b-8132-d2991c949296","expires":"2023-02-22T04:04:34Z"},"sharethrough":{"uid":"4747bec9-c0b3-46e6-99 a7-abb441eb1962","expires":"2025-05-19T23:12:32Z"},"smaato":{"uid":"9f82107dd5","expires":"2025-05-26T19:39:01Z"},"sonobi":{"ui d":"8a6750fc-3f04-4bfa-bfff-ed7efb6225a2","expires":"2025-05-19T23:12:21Z"},"synacormedia":{"uid":"F602645957DD4D74813DCC1C 3C2CC75A","expires":"2025-03-22T04:01:36Z"},"tappx":{"uid":"c2d5fb3d-16ad-497c-b259-ae2f064bf2cbf1a","expires":"2024-09-05T23: 50:14Z"},"telaria_split":{"uid":"a2f2950876a04a9080ddb1d13afbc65a","expires":"2025-03-27T11:28:21Z"},"trustx":{"uid":"0813537b-cc21 -4d61-ba2c-c558c2a32fe2","expires":"2025-03-27T11:28:24Z"},"unruly":{"uid":"RX-d5719144-9db8-45ff-b04a-445190caf210-005","expir es":"2024-12-09T21:07:52Z"},"videobyte":{"uid":"b2363b84-11fc-48a0-acf4-cff415c78fed","expires":"2023-08-05T10:33:17Z"},"visx":{"ui d":"3f6bb121-e397-46ab-8200-b19d153b004b","expires":"2025-05-26T19:38:56Z"},"zeroclickfraud":{"uid":"9f294c04-4c56-3994-c02f-f42 6bdf94e63","expires":"2025-03-22T04:04:19Z"}}}

Answer:  Paragraph 106 purports to rely on a source referenced in footnote 53, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to whether Figure 12 depicts the "UIDS values for Plaintiff," and on that basis denies the allegation.  Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 106, which concern third parties, and on that basis denies them.

107.    This is a non-exhaustive list of the entities with whom Microsoft syncs its user cookies.  Suffice it to say, Microsoft is syncing its user cookie with numerous registered data brokers to collect as much information about a user as possible and de-anonymize the user, all of which is used for advertising purposes.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 107, which concern third parties, and on that basis denies them.

108.    The ADNXS Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." (*Greenley, supra*, 684 F. Supp. 3d at 1050.)

Answer:  Paragraph 108 consists of legal conclusions and characterizations to which no response is required.  To the extent a response is required, Fox denies all allegations in Paragraph 108.

109.    Further, the ADNXS Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." (See, e.g., *James, supra*, 701 F. Supp. 3d at 952).

Answer:  Paragraph 109 consists of legal conclusions and characterizations to which no response is required.  To the extent a response is required, Fox denies all allegations in Paragraph 109.

110.    Because the ADNXS Tracker captures the outgoing information—the IP address, Device Metadata, and unique user IDs—from visitors to the Website, it is a "pen register" for the purposes of CIPA § 638.50(b). The ADNXS Tracker is also a "pen register" because its uuid2 cookie is used to ascertain the identity of the user communicating with the Website, and thus constitutes "addressing" information.

Answer:  Paragraph 110 purports to quote Cal. Penal Code § 638.50(b), which speaks for itself.  As to the allegations in Paragraph 110 that contain legal conclusions and characterizations, no response is required.   To the extent a response is required, Fox denies all allegations in Paragraph 110.

3.    *The OpenX Tracker On The Fox News Website*

111.    OpenX is a registered data broker in California[54] that develops, a "tool to help [companies, like Defendant,] utilize their [first party] data, leverage [third party data], and package up audiences for marketers that will drive ad revenue."[55]

Answer:  Paragraph 111 purports to rely on a source referenced in footnote 54 and quote from a source referenced in footnote 55, both of which speak for themselves.  Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 111, which concern third parties, and on that basis denies them.

---

[54] *Data Broker Registration for OpenX Technologies, Inc*., Office of the Attorney General, https://oag.ca.gov/data-broker/registration/193614 (last accessed Feb. 18, 2025).

[55] *OpenAudience*, OpenX, https://www.openx.com/why-openx/openaudience/ (last accessed Jan. 27, 2025).

112.    OpenX takes this data and uses it to "match [a company's] audience against [OpenX's] graph to put users in audience segments that [OpenX] mak[es] available to marketers."[56]

Answer:  Paragraph 112 purports to quote from a source referenced in footnote 56, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 112, which concern third parties, and on that basis denies them.

113.    In other words, OpenX compiles comprehensive user profiles by tracking users across the Internet. OpenX then enriches the information of its client's end users (like Defendants' end users) with the profile data to make that information more valuable to advertisers by aggregating that information into a graph, thereby driving Defendants' revenue. To achieve this, OpenX uses its OpenAudience Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendants' Website.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 113 that concern any particular Website visitor or the conduct of third parties, and on that basis denies them.  As to the allegations in Paragraph 113 that contain legal conclusions, no response is required.  Fox denies all remaining allegations in Paragraph 113.

114.    The first time a user visits Defendants' Website, the user's browser sends an HTTP request to Defendants' server, and Defendants' server sends an HTTP response with directions to install the OpenX Tracker on the user's browser. The OpenX Tracker, in turn, instructs the user's browser to send OpenX the user's IP address and Device Metadata.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 114 concerning any particular Website visitor or a third party, and on that basis denies them.  Fox denies all remaining allegations in Paragraph 114.

115.    Moreover, OpenX stores a cookie (the "i" value in the screenshot below) with the user's IP address and Device Metadata in the user's browser cache. When the user subsequently

---

[56] *Data Activation*, OpenX, https://www.openx.com/why-openx/openaudience/ (last accessed Feb. 3, 2025).

visits Defendants' Website, the OpenX Tracker locates the cookie identifier stored on the user's browser. If the cookie is stored on the browser, the OpenX Tracker causes the browser to send the cookie along with the user's IP address and Device Metadata to OpenX. A general diagram of this process is pictured as Figure 5, which explains how the Website causes the OpenX Tracker to install a cookie on the user's browser and instructs the user's browser to send the user's IP address and Device Metadata along with the cookie.

Answer: Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 115 and Figure 5 concerning any particular Website visitor or a third party's conduct and capabilities, and on that basis denies them. Fox is also without sufficient knowledge or information to form a belief as to whether Figure 5 accurately depicts the "process" that Plaintiff alleges it does in Paragraph 115. Fox denies all remaining allegations in Paragraph 115.

116.    If the user clears his or her cookies, then the user wipes out the OpenX Tracker from its cache. Accordingly, the next time the user visits Defendants' Website the process begins over again: (i) Defendants' server installs the OpenX Tracker on the user's browser, (ii) the OpenX Tracker instructs the browser to send OpenX the user's IP address and Device Metadata, (iii) the OpenX Tracker stores a cookie in the browser cache, and (iv) OpenX will continue to receive the user's IP address and Device Metadata on subsequent Website visits as part of the cookie transmission.

Answer: Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 116 concerning any particular internet user or Website visitor or the conduct of a third party, and on that basis denies them. Fox denies all remaining allegations in Paragraph 116.

117.    In all cases, however, OpenX receives a user's IP address, Device Metadata, and user information every time its Tracker is loaded Website, as the below screenshots of traffic from

Plaintiff's browser indicate (relevant portions highlighted in red boxes). (See Figure 13 [Plaintiff

Echeverria-Corzan's browser].)

**Figure 13:**



Answer: Fox is without sufficient knowledge or information to form a belief as to the

allegations in Paragraph 117 concerning any particular Website visitor or the conduct of a third

party, and on that basis denies them. Fox is also without sufficient knowledge or information to

form a belief as to whether Figure 13 depicts "traffic from Plaintiff's browser" or "Plaintiff

Echeverria-Corzan's browser," as alleged in Paragraph 117, and on that basis denies the

allegations. Fox denies all remaining allegations in Paragraph 117.

118. The OpenX Tracker is at least a "process" because it is "software that identifies

consumers, gathers data, and correlates that data." (*Greenley*, supra, 684 F. Supp. 3d at 1050.)

Answer:  Paragraph 118 consists of legal conclusions and characterizations to which no response is required.  To the extent a response is required, Fox denies all allegations in Paragraph 118.

119.    Further, the OpenX Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." (*James*, supra, 701 F. Supp. 3d at 952.)

Answer:  Paragraph 119 consists of legal conclusions and characterizations to which no response is required.  To the extent a response is required, Fox denies all allegations in Paragraph 119.

120.    Because the OpenX Tracker captures the outgoing information—the IP address— from visitors to websites, it is a "pen register" for the purposes of CIPA § 638.50(b).

Answer:  Paragraph 120 purports to quote Cal. Penal Code § 638.50(b), which speaks for itself.  Paragraph 120 consists of legal conclusions and characterizations to which no response is required.  To the extent a response is required, Fox denies all allegations in Paragraph 120.

## DEFENDANTS' CONDUCT CONSTITUTES AN INVASION OF PLAINTIFF'S AND CLASS MEMBERS' PRIVACY

121.    The collection of Plaintiff's and Class Members' personally identifying, deanonymized information through Defendants' installation and use of the Trackers constitutes an invasion of privacy.

Answer:  Paragraph 121 consists of legal conclusions and characterizations to which no response is required.  To the extent a response is required, Fox denies all allegations in Paragraph 121.

122.    As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendants' revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

Answer:  Denied.

123.    To put the invasiveness of Defendants' violations of the CIPA into perspective, however, it is important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

Answer:  Denied.

124.    In short, the import of these concepts is that: (i) all of the Third Parties are data brokers that collect user information from Website visitors to uniquely identify and de-anonymize users by combining their IP addresses, Device Metadata, and unique ID values with whatever information those Third Parties have on a user from other sources; (ii) the Third Parties share that information amongst one another and with other entities to create the most complete user profile they can (through cookie syncing); and (iii) those profiles are offered up for sale through the real-time bidding process.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 124 concerning any particular Website visitor or the conduct of third parties, and on that basis denies them.  Fox denies all remaining allegations in Paragraph 124.

**A.    Data Brokers And Real-Time Bidding: The Information Economy**

125.    To put the invasiveness of Defendants' violations of the CIPA into perspective, it is also important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

Answer:  Denied.

*1.    Data Brokers*

126.    While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[57] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions. (Cal. Civ. Code § 1798.99.80(c).)

---

[57] Justin Sherman, *Data Brokers and Sensitive Data on U.S. Individuals: Threats to American Civil Rights, National Security, and Democracy*, 2 (Duke Sanford Cyber Policy Program, 2021), https://tinyurl.com/hy9fewhs.

1    <u>Answer</u>: Paragraph 126 purports to quote from a source referenced in footnote 57 and from

2    Cal. Civil Code § 1798.99.80(c), both of which speak for themselves. As to the allegations of

3    Paragraph 126 that contain legal conclusions, no response is required.

4    127.    Any entity that qualifies as a "data broker" under California law must specifically

5    register as such Cal. Civ. Code § 1798.99.82(a), which both PubMatic[58] and OpenX[59] do.

6    <u>Answer</u>: Paragraph 127 purports to rely on Cal. Civil Code § 1798.99.82(a) and the sources

7    referenced in footnotes 58 and 59, all of which speak for themselves. As to the allegations of

8    Paragraph 127 that contain legal conclusions, no response is required.

9    128.    "Data brokers typically offer pre-packaged databases of information to potential

10    buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise

11    shar[ing] the data with third parties."[60] Such databases are extensive, and can "not only include

12    information publicly available [such as] from Facebook but also the user's exact residential

13    address, date and year of birth, and political affiliation," in addition to "inferences [that] can be

14    made from the combined data."[61]

15    <u>Answer</u>: Paragraph 128 purports to quote from the sources referenced in footnotes 60 and

16    61, both of which speak for themselves. Fox is without sufficient knowledge or information to

17    form a belief as to the remaining allegations in Paragraph 128, which concern third parties, and on

18    that basis denies them.

19    129.    For instance, the NATO report noted that data brokers collect two sets of

20    information: "observed and inferred (or modelled)." The former "is data that has been collected

21    and is actual," such as websites visited. Inferred data "is gleaned from observed data by modelling

22

23    [58] *Data Broker Registration for PubMatic, Inc.*, Office of the Attorney General, https://oag.ca.gov/data-broker/registration/186702 (last accessed Feb. 18, 2025).

24
25    [59] *Data Broker Registration For OpenX Technologies, Inc.*, Office of the Attorney General, https://oag.ca.gov/data-broker/registration/193614 (last accessed Feb. 18, 2025).

26    [60] Sherman, *supra* note 32, at 2.

27    [61] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: Proceedings of the 2015 ACM on Conference

28    on Online Social Networks 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

or profiling," meaning what users may be expected to do. On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[62]

Answer:  Paragraph 129 purports to quote from the website referenced in footnote 62, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 129, which concern third parties, and on that basis denies them.

130.    Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[63] The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[64]

Answer:  Paragraph 130 purports to quote from the website referenced in footnotes 63 and 64, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 130, which concern third parties, and on that basis denies them.

131.    This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[65]

---

[62] Twetman & Bergmanis-Korats, *supra* note 19, at 11.

[63] Sherman, *supra* note 32, at 1.

[64] *Id.*

[65] *Id.* at 9.

1    <u>Answer:</u>  Paragraph 131 purports to quote from a source referenced in footnote 65, which

2    speaks for itself.  Fox denies all remaining allegations in Paragraph 131.

3        132.    As another example:

4        Data brokers also hold highly sensitive data on U.S. individuals such
         as race, ethnicity, gender, sexual orientation, immigration status,

5        income level, and political preferences and beliefs (like support for
         the NAACP or National LGBTQ Task Force) that can be used to

6        directly undermine individuals' civil rights. Even if data brokers do
         not explicitly advertise these types of data (though in many cases

7        they do), everything from media reporting to testimony by a Federal
         Trade Commission commissioner has identified the risk that data

8        brokers use their data sets to make "predictions" or "inferences"
         about this kind of sensitive information (race, gender, sexual

9        orientation, etc.) on individuals.

10       This data can be used by commercial entities within the U.S. to
         discriminately target goods and services, akin to how Facebook

11       advertising tools allow advertisers to exclude certain groups, such
         as those who are identified as people with disabilities or those who

12       are identified as Black or Latino, from seeing advertisements. Many
         industries from health insurance to life insurance to banking to

13       ecommerce purchase data from data brokers to run advertisements
         and target their services.

14
         …
15
         Given identified discrimination problems in machine learning

16       algorithms, there is great risk of these predictive tools only further
         driving up costs of goods and services (from insurance to housing)

17       for minority groups.[66]

18       <u>Answer:</u>  Paragraph 132 purports to quote from a source referenced in footnote 66, which

19    speaks for itself.  Fox denies all remaining allegations in Paragraph 132.

20       133.    Similarly, as the report from NATO noted, corporate data brokers cause numerous

21    privacy harms, including but not limited to depriving users of the right to control who does and

22    doe not acquire their personal information, unwanted advertisements that can even go as far as

23    manipulating viewpoints, and spam and phishing attacks.[67]

24

25

26

27    [66] *Id.*

28    [67] Twetman & Bergmanis-Korats, *supra* note 19, at 8.

ANSWER TO FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 25-cv-04253-AMO

**Figure 14:**



Answer: Paragraph 133 and Figure 14 purport to rely on a source referenced in footnote 67, which speaks for itself. Fox denies all remaining allegations in Paragraph 133.

134.    As noted above, data brokers, like PubMatic and OpenX, are able to compile such wide swaths of information in part by collecting users' IP addresses and Device Metadata, which are used by data brokers, like PubMatic and OpenX, to track users across the Internet.[68]

Answer: Paragraph 134 purports to rely on a source referenced in footnote 68, which speaks for itself. Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 134 concerning the conduct of third parties, and on that basis denies them. Fox denies all remaining allegations in Paragraph 134.

---

[68] *Id.* at 11.

135.     Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[69]

Answer:  Paragraph 135 purports to quote from a source referenced in footnote 69, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 135 concerning the conduct of third parties, and on that basis denies them. Fox denies all remaining allegations in Paragraph 135.

136.     These data brokers will then: take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[70]

Answer:  Paragraph 136 purports to quote from a source referenced in footnote 70, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 136 concerning the conduct of third parties, and on that basis denies them. Fox denies all remaining allegations in Paragraph 136.

137.     In short, by collecting IP addresses and Device Metadata, data brokers, like PubMatic and OpenX, can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 137 concerning the conduct of third parties, and on that basis denies them.

---

[69] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, McAfee (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[70] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, Fathom Analytics (May 10, 2022), https://usefathom.com/blog/data-brokers.

138.    As a result of Defendants' installation the trackers of data brokers, like PubMatic and OpenX, on the browsers of users of Defendants' Website, the information of Plaintiff and Class Members is linked to any profiles these data brokers may have about them using their IP addresses and Device Metadata (or new profiles are created for Plaintiff and Class Members).

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 138 that concern any particular Website visitor or the conduct of third parties, and on that basis denies them.  Fox denies all remaining allegations in Paragraph 138.

139.    These profiles are then served up to any companies that want to advertise on Defendants' Website, and Defendants' users become more valuable as a result of having their IP addresses and Device Fingerprint Information linked to these data broker profiles. Thus, Defendants are unjustly enriched through advertising revenue by installing the Trackers on Plaintiff's and Class Members' browsers, and thus, enabling the Third Parties to collect Plaintiff's and Class Members' IP addresses and Device Metadata without consent.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 139 that concern any particular Website visitor or the conduct of third parties, and on that basis denies them.  Fox denies all remaining allegations in Paragraph 139.

2.    *Real-Time Bidding*

140.    So, once data brokers like PubMatic and OpenX, collect Website users' IP addresses and Device Metadata, how do they "sell" or otherwise help Defendants monetize that information? This is where real-time bidding comes in.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 140, which concern the conduct of third parties, and on that basis denies them.

141.    "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[71]

Answer: Paragraph 141 purports to quote a source referenced in footnote 71, which speaks for itself. Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 141, which concern the conduct of third parties, and on that basis denies them.

142.    "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP, which is at least one function of the PubMatic Tracker[72] where these "work with website or app publishers to help them participate in the RTB process." "DSPs [which is what the ADNXS Tracker is[73]] primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they put forth."[74] And an Advertising Exchange—which Microsoft[75] also provides— "allows advertisers and publishers to use the same technological platform, services, and methods, and "speak the same language" in order to exchange data, set prices, and ultimately serve an ad."[76]

---

[71] Sara Geoghegan, *What is Real Time Bidding?*, Electronic Privacy Information Center (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[72] See, e.g., PubMatic SSP, https://pubmatic.com/products/pubmatic-ssp-for-publishers/ (last accessed Feb. 18, 2025).

[73]          *Microsoft          Invest*,          Microsoft, https://about.ads.microsoft.com/en/solutions/technology/microsoftinvest-dsp (last accessed Feb. 18, 2025) ("Microsoft Invest is a demand-side platform built for the future of video advertising.").

[74] Geoghegan, *supra* note 46.

[75]    *About    Microsoft    Invest*,    Microsoft    (Feb.    12,    2024), https://learn.microsoft.com/enus/xandr/invest/about-invest ("The Microsoft Advertising platform is a real-time bidding system and ad server.").

[76]    *Introducing    To    Ad    Serving*,    Microsoft    Ignite    (Mar.    3,    2024), https://learn.microsoft.com/enus/xandr/industry-reference/introduction-to-ad-serving.

1   <u>Answer:</u>  Paragraph 142 purports to quote websites in footnotes 72, 73, 74, 75, and 76, all

2   of which speak for themselves.  Fox is without sufficient knowledge or information to form a belief

3   as to the remaining allegations in Paragraph 142, which concern the conduct of third parties, and

4   on that basis denies them.

5   143.    In other words, SSPs like the PubMatic Tracker provide user information to

6   advertisers that might be interested in those users, DSPs like the ADNXS Tracker help advertisers

7   select which users to advertise and target, and an Advertising Exchange like Microsoft's is the

8   platform on which all of this happens.

9   <u>Answer:</u>  Fox is without sufficient knowledge or information to form a belief as to the

10  allegations in Paragraph 143, which concern the conduct of third parties, and on that basis denies

11  them.

12  144.    The RTB process works as follows:

13  After a user loads a website or app, an SSP [here, PubMatic] will
    send user data to Advertising Exchanges … The user data, often
14  referred to as "bidstream data," contains information like device
    identifiers, IP address, zip/postal code, GPS location, browsing
15  history, location data, and more. After receiving the bidstream data,
    an Advertising Exchange will broadcast the data to several DSPs
16  [here, Microsoft]. The DSPs will then examine the broadcasted data
    to determine whether to make a bid on behalf of their client.

17
    Ultimately, if the DSP wins the bid, its client's advertisement will
18  appear to the user. Since most RTB auctions are held on the
    server/exchange side, instead of the client/browser side, the user
19  only actually sees the winner of the auction and would not be aware
    of the DSPs who bid and lost. But even the losing DSPs still benefit
20  because they also receive and collect the user data broadcasted
    during the RTB auction process. This information can be added to
21  existing dossiers DSPs have on a user. [77]

22

23

24

25

26

---

27  [77]    Geoghegan,  *supra*  note  46;  see  also  *Real-Time  Bidding*,  Appsflyer,

28  https://www.appsflyer.com/glossary/real-time-bidding/ (last accessed Feb. 18, 2025).

**Figure 15:**



Answer:  Paragraph 144 and Figure 15 purport to quote from and rely on websites in footnote 77, which speak for themselves.  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 144 and Figure 15 that concern the conduct of third parties, and on that basis denies them.

145.    Facilitating this real-time bidding process means a DSP like Microsoft must have as much information as possible about Defendants' users to procure the greatest interest from advertisers and the highest bids. But Microsoft receives assistance because Defendants also install the PubMatic and OpenX Trackers on its users' browsers:

> the economic incentives of an auction mean that DSP with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP). DSPs send bid requests to DMPs, who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers [here, PubMatic and OpenX]. The DSP with the highest bid not only wins the right to deliver the ad—through the SSP—to the individual. The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[78]

---

[78] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey; *see also* PERION, WHAT IS A SUPPLY-SIDE PLATFORM (SSP): DEFINITION AND IMPORTANCE, https://perion.com/publishers/what-is-a-supply-side-platform-ssp-definition-and-importance/.

**Figure 16:**



Answer:   Paragraph 145 and Figure 16 purport to quote from and rely on a source referenced in footnote 78, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 145 and Figure 16 that concern any particular Website visitor or the conduct of third parties, and on that basis denies them.  Fox denies the remaining allegations in Paragraph 145.

146.    In other words, an SSP like PubMatic can solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information PubMatic knows about that user with the information the many data brokers it syncs with know about that user. This includes users' IP addresses and Device Metadata, which are used in conjunction with the unique IDs to match those users to profiles in those data brokers' repositories. If there is a match, then PubMatic will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids). The same is true of Microsoft, whose ADNXS Tracker syncs with data brokers to allow advertisers to better search for and target their bids. All of this naturally enriches Defendant, as its users have now become more valuable.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 146 that concern any particular Website visitor or the conduct of third parties, and on that basis denies them.  To the extent the allegations in Paragraph 146 purport to

1  summarize or describe information from published materials, the publications speak for

2  themselves. Fox denies all remaining allegations in Paragraph 146.

3      147.  As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time

4  bidding presents potential concerns," including but not limited to:

5         (i)  "incentiviz[ing] invasive data-sharing" by "push[ing]
           publishers [*i.e.*, Defendant] to share as much end-user data
6             as possible to get higher valuation for their ad inventory—
           particularly their location data and cookie cache, which can
7             be used to ascertain a person's browsing history and
           behavior."

8         (ii)  "send[ing] sensitive data across geographic borders."
9

10         (iii)  sending consumer data "to potentially dozens of bidders
           simultaneously, despite only one of those parties—the
11             winning bidder actually using that data to serve a targeted
           ad. Experts have previously cautioned that there are few (if
12             any) technical controls ensuring those other parties do not
           retain that data for use in unintended ways."[79]

13      <u>Answer:</u> Paragraph 147 purports to quote a source referenced in footnote 79, which speaks

14  for itself. To the extent a response is required, Fox denies all allegations in Paragraph 147.

15      148.  Given Microsoft operates a DSP here, the last point is particularly relevant, as it

16  means Microsoft—through the ADNXS Tracker—collects and discloses Website users'

17  information to all prospective advertisers, even if advertisers do not ultimately show a user an

18  advertisement. This greatly diminishes the ability of users to control their personal information.

19      <u>Answer:</u> Fox is without sufficient knowledge or information to form a belief as to the

20  allegations in Paragraph 148 that concern any particular Website visitor or the conduct of third

21  parties, and on that basis denies them. Fox denies all remaining allegations in Paragraph 148.

22

23

24

25

26  [79] Staff in the Office of Technology & Division of Privacy and Identity Protection, *Unpacking*
27  *Real Time Bidding through FTC's case on Mobilewalla, Federal Trade Commission* (Dec. 3,
2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-
28  biddingthrough-ftcs-case-mobilewalla.

ANSWER TO FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 25-cv-04253-AMO

149.    Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[80]

Answer: Paragraph 149 purports to quote a source referenced in footnote 80, which speaks for itself. To the extent a response is required, Fox denies all allegations in Paragraph 149.

150.    For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[81].

**Figure 17:**



Answer: Paragraph 150 and Figure 17 purport to quote from and rely on a source referenced in footnote 81, which speaks for itself. To the extent a response is required, Fox denies all allegations in Paragraph 150.

151.    All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one the CIPA was enacted to protect against. (*Ribas v. Clark* (1985) 38 Cal. 3d 355, 361 [noting the CIPA was drafted

---

[80] Geoghegan, *supra* note 46.

[81] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

1  with a two-party consent requirement to protect "the right to control the nature and extent of the

2  firsthand dissemination of [one's] statements"]; *U.S. Dep't of Justice v. Reporters Comm. for*

3  *Freedom of the Press* (1989) 489 U.S. 749, 763-64 ["[B]oth the common law and the literal

4  understandings of privacy encompass the individual's control of information concerning his or her

5  person."].)

6  Answer:  Paragraph 151 consists of legal conclusions and characterizations to which no

7  response is required.  To the extent a response is required, Fox denies all allegations in Paragraph

8  151.

9  *3.  Cookie Syncing*

10  152.  It should now be clear both the capabilities of the Third Parties (i.e., data brokers

11  who de-anonymize users) and the reasons Defendants install their Trackers (to provide for

12  advertisers in real-time bidding). The final question is how do these Third Parties share information

13  amongst each other and with others to offer the most complete user profiles up for sale? This

14  occurs through "cookie syncing."

15  Answer:  Denied.

16  153.  Cookie syncing is a process that "allow[s] web companies to share (synchronize)

17  cookies, and match the different IDs they assign for the same user while they browse the web."[82]

18  This allows entities like the Third Parties to circumvent "the restriction that sites can't read each

19  other cookies, in order to better facilitate targeting and real-time bidding."[83]

20  Answer:  Paragraph 153 purports to quote from sources referenced in footnotes 82 and 83,

21  which speak for themselves.  Fox is without sufficient knowledge or information to form a belief

22  as to the allegations in Paragraph 153 that concern the conduct of third parties, and on that basis

23  denies them.  Fox denies all remaining allegations in Paragraph 153.

---

[82] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[83] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6BCCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

154.    Cookie syncing works as follows:

Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rdparties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.

Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).

…

When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user. Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join)* two different identities (cookies) of the same user on the web.[84]

_____

[84] Papadopoulos, *supra*, at 1433.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Figure 18:**



Answer:   Paragraph 154 and Figure 18 purport to quote from and rely on a source referenced in footnote 84, which speaks for itself.   Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 154 that concern the conduct of third parties, and on that basis denies them.  Fox denies all remaining allegations in Paragraph 154.

155.    Through this process, third party trackers are not only able to resolve user identities (e.g., learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[85]

Answer:  Paragraph 155 purports to quote from a source referenced in footnote 85, which speaks for itself.   Fox is without sufficient knowledge or information to form a belief as to the

---

[85] Papadopoulos, *supra*, at 1434.

ANSWER TO FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 25-cv-04253-AMO

1    allegations in Paragraph 155 that concern the conduct of third parties, and on that basis denies

2    them.  Fox denies all remaining allegations in Paragraph 155.

3    156.    On the flip side, "CSync may re-identify web users even after they delete their

4    cookies."[86] "[W]hen a user erases her browser state and restarts browsing, trackers usually place

5    and sync a new set of userIDs, and eventually reconstruct a new browsing history."[87] But if a

6    tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then

7    through CSync, all of them can link the user's browsing histories from before and after her state

8    erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully

9    erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[88]

10    <u>Answer:</u>  Paragraph 156 purports to quote from a source referenced in footnotes 86, 87, 88,

11    and 89, which speaks for itself.  Fox is without sufficient knowledge or information to form a

12    belief as to the allegations in Paragraph 156 that concern the conduct of third parties, and on that

13    basis denies them.  Fox denies all remaining allegations in Paragraph 156.

14    157.    Thus, "syncing userIDs of a given user increases the user identifiability while

15    browsing, thus reducing their overall anonymity on the Web."[89]

16    <u>Answer:</u>  Paragraph 157 purports to quote from a source referenced in footnotes 86, 87, 88,

17    and 89, which speaks for itself.  Fox is without sufficient knowledge or information to form a

18    belief as to the allegations in Paragraph 157 that concern the conduct of third parties, and on that

19    basis denies them.  Fox denies all remaining allegations in Paragraph 157.

20    158.    Cookie syncing is precisely what is happening here. When the PubMatic and

21    ADNXS Trackers are installed on Website users' browsers, they are calling other third parties to

22    the Website (*e.g.*, Tapad, Epsilon, LiveRamp, Neustar), and PubMatic and Microsoft are syncing

23    its cookies with these entities. The result of this process is not only that a single user is identified

24

25    [86] *Id.*

26    [87] *See id.*

27    [88] *Id.*

28    [89] *Id.* at 1441.

as one person by these multiple third parties, but they share all of the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from actually being anonymous when they visit the Website.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 158 that concern any particular Website visitor or the conduct of third parties, and on that basis denies them.  Fox denies all remaining allegations in Paragraph 158.

*        *        *

159.    To summarize the proceeding allegations, the Third Parties are data brokers that focus on collecting as much information about Website users as possible to create comprehensive user profiles. The Third Parties may collect IP Addresses, Device Metadata, and unique user IDs in the first instance, but those are connected to information the Third Parties glean from other sources to build comprehensive profiles. Through "cookie syncing," those profiles are shared amongst the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible. And those profiles are offered up for sale to interest advertisers through real-time bidding, where users will command more value the more advertisers know about a user. Thus, the Third Parties enrich the value Defendants' users would otherwise command by tying the data they obtain directly from users on the Website (e.g., IP addresses, Device Metadata, unique IDs) with comprehensive user profiles in their possession or in the possession of data brokers they sync with.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 159 that concern the conduct of third parties, and on that basis denies them.  To the extent Paragraph 159 purports to "summarize the proceeding [sic] allegations," Fox incorporates its responses to the preceding allegations in its answer to Paragraph 159.  As to the allegations in Paragraph 159 that contain legal conclusions, no response is required.  To the extent a response is required, Fox denies the remaining allegations in Paragraph 159.

160.    Accordingly, Defendants are using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii)

monetize its Website by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

<u>Answer:</u>  Denied.

161.    Thus, Defendants are unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendants' user inventory in an ad-buying system. In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and advertisers themselves without knowledge or consent. And, because Defendants install the Trackers on Plaintiff's and Class Members' browsers, the Third Parties continue to track Plaintiff and Class Members wherever they go online, this building even more comprehensive user profiles over time that are provider to the third parties' other clients (or further enrich Defendants here).

<u>Answer:</u>  Denied.

**B.    Defendants Use The PubMatic Tracker For Targeted Advertising, Identity Resolution, and Data Monetization**

162.    As noted above, PubMatic is a registered data broker in California that describes itself as a digital advertising platform that "exist[s] to enable content creators to run a more profitable advertising business, which in turn allows them to invest back into the multi-screen and multi-format content that consumers demand."[90]

<u>Answer:</u>  Paragraph 162 purports to quote from a source referenced in footnote 90, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 162, which concern the conduct of third parties, and on that basis denies them.

---

[90] *The Supply Chain Of The Future*, PubMatic, https://pubmatic.com/about-us (last accessed Feb. 18, 2025).

163.    PubMatic helps companies like Defendants monetize the data of Website users. As noted above, PubMatic is a "supply side platform" that helps website operators like Defendants "[m]aximize advertising revenue and control how your audiences are accessed."[91]

Answer:  Paragraph 163 purports to quote from a source referenced in footnote 91, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 163, which concern the conduct of third parties, and on that basis denies them.

164.    To do this, PubMatic provides a "unique, supply path optimized and addressable brand demand—from the SSP of choice for the top advertisers and agencies in the world."[92]

**Figure 19:**



Answer: Paragraph 164 and Figure 19 purport to quote from and rely on a source referenced in footnote 92, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 164, which concern the conduct of third parties, and on that basis denies them.

165.    Likewise, PubMatic provides identity resolution the "Identity Hub" service, "a leading ID management tool for publishers that leverages specialized technology infrastructure to

[91] *The Digital Advertising Supply Chain of the Future. Delivered.* PubMatic SSP, https://pubmatic.com/products/pubmatic-ssp-for-publishers/ (last accessed Feb. 18, 2025).
[92] *Id.*

simplify the complex alternative identifier marketplace."[93] This allows website operators like Defendants to "drive monetization in cookie-restricted environments" by "[c]onnect[ing] seamlessly with buyers to drive programmatic revenue."[94]

Answer: Paragraph 165 purports to quote from a source referenced in footnotes 93 and 94, which speaks for itself. Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 165 that concern the conduct of third parties, and on that basis denies them. Fox denies the remaining allegations in Paragraph 165.

166.    Notably, PubMatic also touts its ability to integrate with multiple other third parties— including "over 75 identity and data providers"—"leverage leading identifiers" to "help data owners [like Defendant] driver monetization and help media buyers [i.e., advertisers] drive performance"[95]:

**Figure 20:**



*Connect is PubMatic's audience solution that leverages addressable signals from across the open internet to help data owners drive monetization and help media buyers drive performance.

---

[93] Identity Management. Delivered. PubMatic, https://pubmatic.com/products/identity-hub/ (last accessed Feb. 18, 2025).

[94] *Id.*

[95] *Id.*

<u>Answer</u>:    Paragraph 166 and Figure 20 purport to quote from and rely on a source referenced in footnote 95, which speaks for itself.    Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 166, which concern the conduct of third parties, and on that basis denies them.

167.    While PubMatic enables website operators like Defendants to sell their users to advertisers with a variety of characteristics, one of those characteristics is, notably, geography:

**Figure 21:**



<u>Answer</u>:    Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 167, which concern the conduct of a third party, and on that basis denies them.

168.    PubMatic also helps advertisers select where to place their ads, to help companies "[s]mash [their] campaign KPIs [key performance indicators]" and "reach [their] target audiences more effectively."[96] One of the ways in which PubMatic accomplishes this is by selling "action

---

[96] *Connect With PubMatic's Auction Packages*, PubMatic, https://pubmatic.com/auction-packages (last visited Feb. 18, 2025).

packages," which are data sets—pulled together from different sources—to help advertisers target specific customers.[97] In other words, PubMatic utilizes third-party data, as well as data from the publisher where the ad is ultimately placed (*i.e.*, first-party), to determine where to place advertisers' ads and who to place them in front of.

Answer: Paragraph 168 purports to quote from sources referenced in footnotes 96 and 97, which speak for themselves. Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 168, which concern the conduct of a third party, and on that basis denies them.

169. By way of example, PubMatic sells a "Ramadan Auction Package" that targets consumers who observe Ramadan.[98] This package helps companies target people who have indicated interest in Ramadan Events through consumer behavior, have internet search history such as "Prayer & Fasting," have location data that is "[f]requently seen at places of worship," or have "[d]emographic data" that shows they are married or live with people "who have shown interest towards Ramadan."[99]

Answer: Paragraph 169 purports to quote from sources referenced in footnotes 98 and 99, which speak for themselves. Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 169, which concern the conduct of a third party, and on that basis denies them.

170. Thus, when users visit Defendants' Website, PubMatic collects users' IP addresses, Device Metadata, and unique user identifiers through its PubMatic Tracker so that Defendants can identify its users with PubMatic's suite of identity resolution services, sell its users to prospective advertisers, and ultimately reap substantial revenue through the programmatic advertising

---

[97] *Connect With PubMatic's Auction Packages*, PubMatic, https://pubmatic.com/auction-packagesapac (last visited Feb. 18, 2025).

[98] *Connect With PubMatic's Auction Packages: Ramadan*, PubMatic, https://pubmatic.com/auctionpackages-apac (last visited Feb. 18, 2025).

[99] *Id.*

PubMatic assists with. All of this helps Defendants monetize their Website and maximize revenue by enabling PubMatic to collect as much information about Defendants' users as possible.

<u>Answer:</u>  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 170 that concern any particular Website visitor or the conduct of a third party, and on that basis denies them.  Fox denies all remaining allegations in Paragraph 170.

## C.    Defendants Use The ADNXS Tracker For Targeted Advertising And Data Monetization

171.    Microsoft describes its advertising services, which include the ADNXS or Microsoft Invest Tracker, as "a strategic buying platform built for the needs of today's advertisers looking to invest in upper-funnel buying and drive business results."[100] The ADNXS Tracker is a DSP as noted above.

<u>Answer:</u>  Paragraph 171 purports to quote from a source referenced in footnote 100, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 171, which concern the conduct of third parties, and on that basis denies them.

172.    Microsoft collects data to help companies with their marketing; when the processing system "receives ad requests, [it] applies data to the request, receives bids, makes decisions, serves creatives, logs, auctions, etc."[101]

<u>Answer:</u>  Paragraph 172 purports to quote from a source referenced in footnote 101, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 172, which concern the conduct of third parties, and on that basis denies them.

173.    In particular:

> The Microsoft Advertising platform is a real-time bidding system and ad server. The main processing system is called the "impression bus." The impression bus receives ad requests, applies data to the

---

[100] *About Microsoft Invest*, Microsoft (Feb. 12, 2024), https://learn.microsoft.com/enus/xandr/invest/about-invest.

[101] *Id.*

request, receives bids, makes decisions, serves creatives, logs auctions, etc. Ad calls come in via our inventory supply partners: exchanges, SSPs, ad networks, and a few valued publishers.

…

Once we get the call, we overlay segment data from our server-side cookie store. Data is added to the cookie store either through Xandr segment pixels or by clients sending us a file of data. We also contact third-party data providers and overlay any available data. We contact all of the bidders on our platform. The ad call includes whatever user data belongs to each bidder, and information about the inventory. Bidders have a certain number of milliseconds in which to respond with a bid and the creative they want to serve.

…

The impression bus decides which bid wins based on the amount of the bid, and any preferences the publisher has about what they want served on their page. If the call was client-side, Microsoft Advertising serves the ad. If it was server-side, Microsoft Advertising passes the bid and the location of the creative to the partner who will ultimately serve the ad.[102]

    <u>Answer:</u>  Paragraph 173 purports to quote from a source referenced in footnote 102, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 173, which concern the conduct of third parties, and on that basis denies them.

    174.  Microsoft Invest (i.e., the ADNXS Tracker) provides "targeting, bidding algorithms, multi-currency support, and all the other features of a premium ad server."[103] To do this, Microsoft utilizes data from its cookie store. The "[d]ata is added to the cookie store either through Microsoft Advertising segment pixels or by clients sending [them] a file of data. [They] also contact third-party data providers and overlay any available data."[104]

    <u>Answer:</u>  Paragraph 174 purports to quote from a source referenced in footnotes 103 and 104, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief

---

[102] *Id.*

[103] *Id.*

[104] *Id.*

as to the remaining allegations in Paragraph 174, which concern the conduct of third parties, and on that basis denies them.

175.    Microsoft also integrates with the PubMatic and OpenX Trackers on Defendants' Website to enrich Defendants' user data and therefore obtain higher bids to show advertisements to Defendants' users. And Microsoft discloses all of this information to advertisers that bid on Defendants' users, regardless of whether the advertiser actually wins the bid.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 175 that concern any particular Website visitor or the conduct of a third party, and on that basis denies them.  Fox denies all remaining allegations in Paragraph 175.

176.    Further, Microsoft utilizes data from its cookie store. The "[d]ata is added to the cookie store either through Microsoft Advertising segment pixels or by clients sending [them] a file of data. [They] also contact third-party data providers and overlay any available data."[105]

Answer:  Paragraph 176 purports to quote from a source referenced in footnote 105, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 176, which concern the conduct of third parties, and on that basis denies them.

177.    In other words, when users visit Defendants' Website, Microsoft collects users' IP addresses, Device Metadata, and unique user identifiers through its ADNXS Tracker to provide to advertisers interested in showing an advertisement to Defendants' Website users, enriching that information by integrating with data brokers like TransUnion, and ultimately enabling Defendants to monetize their Website and maximize revenue by enabling Microsoft to collect as much information about Defendants' users as possible.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 177 that concern any particular Website visitor or the conduct of a third party, and on that basis denies them.  Fox denies all remaining allegations in Paragraph 177.

---

[105] *Id.*

1

2

**D.**     **Defendants Use The OpenX Tracker For Identity Resolution, Targeted Advertising, And Data Monetization**

3       178.    As noted above, OpenX is a registered Data Broker in California that claims to be

4   "the world's leading independent supply-side platform for audience, data, and identity

5   targeting."[106]

6       Answer:  Paragraph 178 purports to quote from a source referenced in footnote 106, which

7   speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the

8   remaining allegations in Paragraph 178, which concern the conduct of a third party, and on that

9   basis denies them.

10      179.    OpenX's "proprietary identity resolution tool, OpenAudience, uses state-of-the-art

11   data and identity technology to allow marketers to reach their target audiences and segments—

12   connecting [companies] to [their] desired consumers in more ways than you have ever imagined

13   possible."[107]

14      Answer:  Paragraph 179 purports to quote from a source referenced in footnote 107, which

15   speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the

16   remaining allegations in Paragraph 179, which concern the conduct of a third party, and on that

17   basis denies them.

18      180.    OpenX does this by taking a company's "first-party data, or any pre-built audience

19   segments, and seamlessly match[ing it] to [OpenX's] identity graph of more than 200 million

20   unique people."[108]

21      Answer:  Paragraph 180 purports to quote from a source referenced in footnote 108, which

22   speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the

23   remaining allegations in Paragraph 180, which concern the conduct of a third party, and on that

24   basis denies them.

25

26   [106] *About Us*, OpenX, https://www.openx.com/company/ (last accessed Jan. 27, 2025).

27   [107] *Buyers*, OpenX, https://www.openx.com/company/ (last accessed Jan. 27, 2025).

28   [108] *OpenAudience*, OpenX, https://www.openx.com/company/ (last accessed Jan. 27, 2025).

181.    In other words, OpenAudience gathers information of Defendants' website users, such as IP addresses and Device Metadata, compares it against their own records, and combines the two to enhance the information into a deanonymized profile of each individual website visitor.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 181 that concern any particular Website visitor or the conduct of a third party, and on that basis denies them.  Fox denies all remaining allegations in Paragraph 181.

182.    OpenX can then use these individual profiles to provide marketers, such as Defendant, with curated packages that identify and target specific customers.[109]

Answer:  Paragraph 182 purports to quote from a source referenced in footnote 109, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 182 that concern any particular Website visitor or the conduct of a third party, and on that basis denies them.  Fox denies all remaining allegations in Paragraph 182.

183.    OpenX splits this up into two different types of packages. The first are inventory packages that allows marketers to "[s]howcase [their] brand alongside brand-safe inventory across [OpenX's] network of trusted publishers, reaching consumers wherever and whenever they engage with their favorite content."[110] The second are data driven packages that "[e]ngage customers with packages powered by data-driven curation, and drive performance on brand-safe inventory. [Allowing companies, like Defendants to e]ffortlessly choose from pre-built packages powered by audience, contextual, attention, or sustainability data and [OpenX's] proprietary identity graph."[111]

Answer:  Paragraph 183 purports to quote from a source referenced in footnotes 110 and 111, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief

---

[109] *Curated Packages*, OpenX, https://www.openx.com/curated-packages/ (last accessed Feb. 4, 2025).

[110] *Id.* (emphasis added).

[111] *Id.*

as to the allegations in Paragraph 183 that concern the conduct of a third party, and on that basis denies them.  Fox denies all remaining allegations in Paragraph 183.

184.    This identity graph provides companies, like Defendants and the other Third Parties, access to 800 million hashed emails, 200 million hashed phone numbers, over 200 million U.S. users instrumented for data and identity, 48 million CTV users instrumented for data and identity, over 5,000 requests per user per month, and 3,000 data attributes available for targeting.[112]

**Figure 22:**



**Match**

Integrate your first-party data, or any pre-built audience segments, and seamlessly match to our identity graph of more than 200 million unique people.



**Enrich**

Make your data more useful with more than 3,000+ sortable fields, including consumer habits, lifestyle, spend, and more. Refine your data and get more granular, or expand your audience and create look-alikes.



**Activate**

Data and audience segments are useful only if you can run campaigns against them. We'll give you a simple Deal ID that you can use with the DSP of your choice to reach your audiences across our premium supply.

Answer:  Paragraph 184 and Figure 22 purport to rely on a source referenced in footnote 112, which speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 184 that concern the conduct of a third party, and on that basis denies them.  Fox denies all remaining allegations in Paragraph 184.

185.    In other words, OpenX utilizes third-party data (*i.e.*, data OpenX collects on its own), as well as data from the publisher where the ad is ultimately placed (*i.e.*, first-party, like data directly from Defendants' Website users), to determine where to place advertisers' ads and who to place them in front of.

---

[112] *OpenAudience*, OpenX, https://www.openx.com/company/ (last accessed Jan. 27, 2025).

1    Answer:  Fox is without sufficient knowledge or information to form a belief as to the

2    allegations in Paragraph 185, which concerns the conduct of a third party, and on that basis denies

3    them.

4    186.    By way of example, OpenX sells a "Health Insurance Data Driven Package" that

5    targets consumers who have viewed advertisements from health insurance advertisers.[113] As such,

6    this helps companies target people who have indicated an interest in specific health insurance

7    related content.

8    Answer:  Paragraph 186 purports to rely on a source referenced in footnote 113, which

9    speaks for itself.  Fox is without sufficient knowledge or information to form a belief as to the

10   remaining allegations in Paragraph 186, which concern the conduct of a third party, and on that

11   basis denies them.

12   187.    To do all of this, OpenX needs to collect data that identifies a particular user. This

13   is why OpenX collects IP addresses and Device Metadata: it allows OpenX to link one of

14   Defendants' Website users to any profile OpenX may have about that user, and OpenX can in turn

15   provide that profile to interested advertisers for more targeted advertising. The IP address, Device

16   Metadata, and OpenX cookie, also allow OpenX to track a user's Website activity over time (*i.e.*,

17   through repeated Website visits) and to track that user on other websites.

18   Answer:  Fox is without sufficient knowledge or information to form a belief as to the

19   allegations in Paragraph 187 that concern any particular Website visitor or the conduct of a third

20   party, and on that basis denies them.  Fox denies all remaining allegations in Paragraph 187.

21   188.    In other words, when users visit Defendants' Website, OpenX collects users' IP

22   addresses through its OpenAudience Tracker to build comprehensive user profiles, which are used

23   to identify Defendants' users, enrich Defendants' user data, and make those users more valuable

24   to prospective advertisers by allowing advertisers to better target specific users. All of this helps

25

26

27   [113]    *Health    Insurance    Data    Driven    Package*,    OpenX,

28   https://www.openx.com/curatedpackages/health-insurance/ (last accessed Feb. 4, 2025).

Defendants further monetize its Website and maximize revenue by collecting and disclosing user information.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 188 that concern any particular Website visitor or the conduct of a third party, and on that basis denies them.  As to the allegations in Paragraph 188 that contain legal conclusions, no response is required.  Fox denies all remaining allegations in Paragraph 188.

PLAINTIFF'S EXPERIENCES

A.      Plaintiff Echeverria-Corzan

189.    Plaintiff Echeverria-Corzan regularly visited the Fox News Website on her desktop and mobile browsers—as long ago as July 2024 and as recently as December 2024—and has done so throughout the entirety of the class period.

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 189, and on that basis denies them.

190.    When Plaintiff Echeverria-Corzan visited the Fox News Website, the Fox News Website's code—as programmed by Defendant—caused the Trackers to be installed on Plaintiff Echeverria-Corzan's browser. (See Figures 4, 10, 17, *supra*.)

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegation in Paragraph 190 that Plaintiff visited the Website, and on that basis denies it.  Fox denies all remaining allegations in Paragraph 190.

191.    Through their respective Trackers, the Third Parties collected Plaintiff Echeverria-Corzan's IP address, Device Metadata, and set a cookie with a unique user ID that allowed the Third Parties to pervasively track Plaintiff Echeverria-Corzan across multiple Fox News Website sessions and even other websites, as well as de-anonymize Plaintiff Echeverria-Corzan by synchronizing her user profiles amongst each other and with other entities. (See Figures 6-8, 10-11, 13, 15, 22, *supra*.)

Answer:  Fox is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 191 that concern Plaintiff's alleged visit to the Fox News Website or the

1  conduct of third parties, and on that basis denies them.  Fox denies all remaining allegations in

2  Paragraph 191.

3      192.    Defendants and the Third Parties used the information collected by the Trackers to

4  (i) identity Plaintiff Echeverria-Corzan and either create a new profile of her in the Third Parties'

5  databases or match Plaintiff Echeverria-Corzan to a pre-existing profile (either in the Third Parties'

6  own databases or with another entity's profile), (ii) sell Plaintiff Echeverria-Corzan's information

7  to advertisers for hyper-targeted advertising based (in part) on Plaintiff Echeverria-Corzan's

8  location, (iii) actually target Plaintiff Echeverria-Corza with advertisements based (in part) on

9  Plaintiff Echeverria-Corzan's location, and (iv) boost Defendants', advertisers', and the Third

10 Parties' revenue and the value of the Third Parties' services by de-anonymizing Plaintiff

11 Echeverria-Corzan and selling her data.

12     Answer:  Fox is without sufficient knowledge or information to form a belief as to the

13 allegations in Paragraph 192, and on that basis denies them.

14     193.    Thus, Plaintiff Echeverria-Corzan has had her privacy invaded by Defendants'

15 violations of CIPA § 638.51(a), and Defendants have likewise been unjustly enriched through the

16 Third Parties' surreptitious and unconsented-to collection of Plaintiff Echeverria-Corzan's data.

17 Accordingly, Plaintiff Echeverria-Corzan has been injured by Defendants' violation of the CIPA.

18     Answer:  Paragraph 193 consists of legal conclusions to which no response is required.  To

19 the extent a response is required, Fox denies all remaining allegations in Paragraph 192.

20                          **CLASS ACTION ALLEGATIONS**

21     194.    Pursuant to Cal. Code Civ. Proc. § 382, Plaintiff Echeverria-Corzan seeks to

22 represent a class defined as all California residents who accessed the Fox News Website in

23 California and had their IP address collected by the Trackers (the "Fox News Website Class" or

24 the "Class").

25     Answer:  Paragraph 194 consists of legal conclusions to which no response is required.  To

26 the extent a response is required, Fox admits only that Plaintiff purports to assert her claims on

27 behalf of a putative class but denies that class certification is appropriate as to any putative class.

28

195.    The following people are excluded from the Class: (i) any Judge presiding over this action and members of her or her family; (ii) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest (including current and former employees, officers, or directors); (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendants' counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

Answer:  Paragraph 195 consists of legal conclusions to which no response is required.  To the extent a response is required, Fox admits only that Plaintiff purports to assert her claims on behalf of a putative class but denies that class certification is appropriate as to any putative class.

196.    **Numerosity**: The number of people within the Class is substantial and believed to amount to thousands, if not millions of persons. It is, therefore, impractical to join each member of the Class as a named plaintiff. Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Class is ascertainable and identifiable from Defendants' records.

Answer:  Paragraph 196 consists of legal conclusions to which no response is required.  To the extent a response is required, Fox denies all allegations in Paragraph 196.

197.    **Commonality and Predominance**: There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class Member, include, but are not limited to, the following:

(i)    Whether Defendants violated CIPA § 638.51(a);

(ii)    Whether the Trackers are "pen registers" pursuant to Cal. Penal Code § 638.50(b);

(iii)    Whether Defendants sought or obtained prior consent—express or otherwise—from Plaintiff and the Class;

(iv)    Whether Defendants sought or obtained a court order for its use of the Trackers; and

(v)    Whether Plaintiff and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

Answer:  Paragraph 197 consists of legal conclusions to which no response is required.  To the extent a response is required, Fox denies all allegations in Paragraph 197.

198.    Typicality: The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other members of the Class Members, visited the Website and had their IP address collected by the Trackers, which were installed and used by Defendants.

Answer:  Paragraph 198 consists of legal conclusions to which no response is required.  To the extent a response is required, Fox denies all allegations in Paragraph 198.

199.    Adequate Representation: Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class Members they seek to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of members of the Class will be fairly and adequately protected by Plaintiff and her counsel.

Answer:  Paragraph 199 consists of legal conclusions to which no response is required.  To the extent a response is required, Fox denies all allegations in Paragraph 199.

200.    Superiority: The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class. Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device

1 presents far fewer management difficulties and provides the benefits of single adjudication,

2 economy of scale, and comprehensive supervision by a single court on the issue of Defendants'

3 liability. Class treatment of the liability issues will ensure that all claims and claimants are before

4 this Court for consistent adjudication of the liability issues.

5     <u>Answer:</u>  Paragraph 200 consists of legal conclusions to which no response is required.  To

6 the extent a response is required, Fox denies all allegations in Paragraph 200.

7 **<u>CLAIMS FOR RELIEF</u>**

8 **<u>COUNT I</u>**
**Violation Of The California Invasion Of Privacy Act,**

9 **Cal. Penal Code § 638.51(a)**

10     201.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set

11 forth herein.

12     <u>Answer:</u>  Fox restates and incorporates by reference as if fully set forth herein their answers

13 to Paragraphs 1 through 200.

14     202.    Plaintiff brings this claim individually and on behalf of the members of the

15 proposed Class against Defendant.

16     <u>Answer:</u>  Paragraph 202 consists of legal conclusions to which no response is required.  To

17 the extent a response is required, Fox admits only that Plaintiff purports to assert her claims on

18 behalf of a putative class but denies that class certification is appropriate as to any putative class.

19     203.    CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen

20 register or a trap and trace device without first obtaining a court order."

21     <u>Answer:</u>  Paragraph 203 purports to quote Cal. Penal Code § 638.51(a), which speaks for

22 itself.

23     204.    A "pen register" is a "a device or process that records or decodes dialing, routing,

24 addressing, or signaling information transmitted by an instrument or facility from which a wire or

25 electronic communication is transmitted, but not the contents of a communication." (Cal. Penal

26 Code § 638.50(b).)

27

28

1    <u>Answer:</u>  Paragraph 204 purports to quote Cal. Penal Code § 638.50(b), which speaks for

2    itself.

3        205.    The Trackers are "pen registers" because they are "device[s] or process[es]" that

4    "capture[d]" the "routing, addressing, or signaling information"—the IP address and Device

5    Metadata—from the electronic communications transmitted by Plaintiff's and the Class's

6    computers or smartphones. (Cal. Penal Code § 638.50(b).)

7        <u>Answer:</u>  Paragraph 205 purports to quote Cal. Penal Code § 638.50(b), which speaks for

8    itself.  As to the allegations in Paragraph 205 that contain legal conclusions and characterizations,

9    no response is required.  To the extent a response is required, Fox denies all allegations in

10   Paragraph 205.

11       206.    Likewise, the Trackers are "pen registers" because they are "device[s] or

12   process[es]" that "capture[d]" the unique user identifiers associated with each Tracker from the

13   electronic communications transmitted by Plaintiff's and the Class's computers or smartphones.

14   (Cal. Penal Code § 638.50(b).) The unique IDs are "addressing" information because they are used

15   to tie a Website user to the Third Parties' databases and repositories of information about the user

16   and ascertain the user's identity.

17       <u>Answer:</u>  Paragraph 206 purports to quote Cal. Penal Code § 638.50(b), which speaks for

18   itself.  As to the allegations in Paragraph 206 that contain legal conclusions and characterizations,

19   no response is required.  To the extent a response is required, Fox denies all allegations in

20   Paragraph 206.

21       207.    At all relevant times, Defendants installed the Trackers—which are pen registers—

22   on Plaintiff's and Class Members' browsers, which enabled the Third Parties to collect Plaintiff's

23   and Class Members' IP addresses, Device Metadata, and unique user IDs.

24       <u>Answer:</u>  Denied.

25       208.    Defendants and the Third Parties then used the Trackers to (i) identity Plaintiff

26   Class Members and either create a new profile of them in the Third Parties' databases or match

27   Plaintiff and Class Members to a pre-existing profiles (either in the Third Parties' own databases

28

or with another entity's profile), (ii) sell Plaintiff's and Class Members' information to advertisers for hypertargeted advertising based (in part) on Plaintiff's and Class Members' location, (iii) actually target Plaintiff and Class Members with advertisements based (in part) on Plaintiff's and Class Members' location, and (iv) boost Defendants', advertisers', and the Third Parties' revenue and the value of the Third Parties' services by de-anonymizing Plaintiff and Class Members and selling their data.

Answer: Denied.

209. The Trackers do not collect the content of Plaintiff's and the Class's electronic communications with the Website. (See *In re Zynga Privacy Litig.* (9th Cir. 2014) 750 F.3d 1098, 1108 ["IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…"] [cleaned up].)

Answer: Paragraph 209 consists of legal conclusions and characterizations to which no response is required. To the extent a response is required, Fox denies all allegations in Paragraph 209.

210. Plaintiff and Class Members did not provide their prior consent to Defendants' installation or use of the Trackers.

Answer: Paragraph 210 consists of legal conclusions and characterizations to which no response is required. To the extent a response is required, Fox denies all allegations in Paragraph 210.

211. Defendants did not obtain a court order to install or use the Trackers.

Answer: Fox admits only that it did not obtain a court order in connection with Plaintiff's or Class Members' use of the Website, and it denies that it was required to do so.

212. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendants' violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendants' violations of CIPA § 638.51(a).

1        Answer:  Paragraph 212 consists of legal conclusions and characterizations to which no

2    response is required.  To the extent a response is required, Fox denies all allegations in Paragraph

3    212.

4    **PRAYER FOR RELIEF**

5        WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seek

6    judgment against Defendant, as follows:

7        (a)    For an order certifying the Class, naming Plaintiff as the representative of the Class,

8        and naming Plaintiff's attorneys as Class Counsel to represent the Class;

9        (b)    For an order declaring that Defendants' conduct violates the CIPA;

10        (c)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

11        (d)    For statutory damages of $5,000 for each violation of CIPA § 638.51(a);

12        (e)    For pre- and post-judgment interest on all amounts awarded; and

13        (f)    For an order awarding and the Class their reasonable attorney's fees, expenses, and

14        costs of suit.

15        Answer:  Plaintiff's Prayer for Relief consists of a summary of the relief sought in this

16    action, to which no response is required. To the extent a response is required, Fox denies that

17    Plaintiff is entitled to any of the relief sought in her Prayer for Relief and prays that Plaintiff takes

18    nothing by way of her FAC.

19    **DEMAND FOR JURY TRIAL**

20        Plaintiff, on behalf of themselves and the proposed Class, demand a trial by jury for all of

21    the claims asserted in this Complaint so triable.

22        Answer:  Fox demands a jury trial on all claims, causes of action, and issues so triable.

23    **STATEMENT OF DEFENSES**

24        The following statement of defenses is not intended to characterize any particular defense

25    as "affirmative," nor to  specify which party bears the burden of proof or persuasion on any

26    particular defense.

27

28

**ANSWER TO FIRST AMENDED CLASS ACTION COMPLAINT**
Case No. 25-cv-04253-AMO

**FIRST DEFENSE**

**(Failure to State a Claim for Relief)**

Plaintiff fails to state a claim upon which relief can be granted because she fails to state facts sufficient to constitute a cause of action against Fox.

**SECOND DEFENSE**

**(No Injury)**

Plaintiff's claim is barred, in whole or in part, because she suffered no cognizable injury or damages as a result of the actions she alleges in the FAC, which Fox denies.

**THIRD DEFENSE**

**(No Standing)**

Plaintiff lacks Article III and statutory standing because she did not suffer any concrete injury or damages and alleges only a statutory violation, which Fox denies.

**FOURTH DEFENSE**

**(Public Policy)**

The claims of Plaintiff and the putative class are barred as contrary to public policy, including as reflected in the California Consumer Privacy Act and associated regulations.

**FIFTH DEFENSE**

**(Failure to Meet Requirements of Fed. R. Civ. P. 23)**

Plaintiff is not entitled to maintain her cause as a class action because she fails to meet the requirements of Federal Rule of Civil Procedure 23.

**SIXTH DEFENSE**

**(Consent)**

The claims of Plaintiff and the putative class are barred because Plaintiff and the putative class expressly or impliedly consented to the conduct alleged to have violated CIPA.

**SEVENTH DEFENSE**

**(Failure to Join Necessary or Indispensable Parties)**

Plaintiff has failed to join necessary and indispensable parties to this action.

**EIGHTH DEFENSE**

**(Statute of Limitations)**

The claims of Plaintiff and the putative class are barred, in whole or in part, to the extent they fall outside the time period prescribed by the applicable statute of limitations.

**NINTH DEFENSE**

**(Excessive Fines)**

The statutory damages provided by California Penal Code section 637.2 violate the Excessive Fines Clause of the Eighth Amendment to the United States Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution because they are grossly excessive and arbitrary.

**TENTH DEFENSE**

**(Void for Vagueness)**

Plaintiff's claim is barred in whole or in part because the provision of CIPA under which Plaintiff brings her claim is unconstitutionally vague as applied to the conduct alleged here.

**ELEVENTH DEFENSE**

**(Reservation of Additional Defenses)**

Fox hereby reserves the right to amend its Answer to raise additional defenses as they become available or apparent to Fox through discovery in this matter or otherwise.


Dated:    December 18, 2025                    JENNER & BLOCK LLP


                                    By:    */s/ Brandon Fox*
                                           Brandon Fox
                                           Kate Spelman
                                           Rachael Goldman

                                           *Attorneys for Defendants*
                                           *Fox Corporation and Fox News Network, LLC*

ANSWER TO FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 25-cv-04253-AMO